[Civ. No. 66903. Second Dist., Div. Seven. Aug. 4, 1983.]

MARLENE PONDER et al., Plaintiffs and Appellants, v.
BLUE CROSS OF SOUTHERN CALIFORNIA,
Defendant and Respondent.

**COUNSEL**

Jeffrey B. Harrison for Plaintiffs and Appellants.

Munger, Tolles & Rickershauser, Daniel P. Garcia, Allen M. Katz and Lucy T. Eisenberg for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—This appeal is from a summary judgment in favor of the defendant insurance company, Blue Cross of Southern California (Blue Cross). The plaintiffs, Marlene and Tommie Ponder, are policyholders denied coverage for treatment of a condition suffered by Mrs. Ponder. In response to this refusal, the Ponders filed a complaint seeking declaratory relief as well as damages for breach of contract and tortious breach of implied covenant of good faith and fair dealing. The court granted summary judgment on grounds a provision in the insurance contract effectively ex-

cluded Mrs. Ponder's condition from coverage, hence no triable issues remained.

The central issue on appeal is whether a form insurance contract effectively excludes coverage through a clause couched in undefined technical language not highlighted by location, typesize or otherwise. Under the circumstances of this case, we hold that it does not.

## I. FACTS AND PROCEEDINGS BELOW

In early May 1979, Mrs. Tommie Ponder was suffering earaches, throat pains, coughing and headaches. She sought treatment from Harvey S. Kulber, M.D. He initially diagnosed the problem as upper respiratory infection and blocked Eustachian tubes. By her next visit on May 13, the infection had subsided but the earaches remained. Dr. Kulber's examination including X-rays revealed "severe temporomandibular joint disease, especially on the left side."

A few months later, Mrs. Ponder was experiencing severe headaches with the pain radiating into the ears. Dr. Kulber and his associate, Dr. Seltzer, also a physician, diagnosed the cause as "temporomandibular joint syndrome and etiology of the pain coming from that syndrome." They referred Mrs. Ponder to a clinic at White Memorial Hospital which specialized exclusively in the treatment of temporomandibular joint disease.

During this period, Blue Cross honored payment of the bills for the services of Drs. Kulber and Seltzer including those which indicated the condition treated was temporomandibular joint disease.

The White Memorial Hospital TMJ Clinic is staffed by medical doctors and oral surgeons. Mrs. Ponder was assigned to one of the oral surgeons, Douglas H. Morgan, D.D.S., for screening. He diagnosed her condition as "osteo-arthritic condition of the right and left temporomandibular joints, as well as dysfunction of the left meniscus." According to Dr. Morgan's declaration, this condition is treated by medical doctors or oral surgeons, or both. Moreover, when he performs the surgery often required to cure temporomandibular joint disease, he is assisted by a medical doctor.

Dr. Morgan began treating Mrs. Ponder for this condition by nonsurgical methods which also are helpful should surgery become necessary. From July 17, 1979, through March 13, 1980, Dr. Morgan submitted 23 claims to Blue Cross for these treatments.

These 23 disputed claims were filed under a nongroup insurance contract the Ponders have held since July 1, 1976. This contract is called the "High

Option Performance Plus Plan." The terms of the contract are spelled out in a "certificate" which Blue Cross issues to "subscribers." When Blue Cross chooses to modify coverage, its computer merely sends out a new certificate to replace the superseded version.

During the period Mrs. Ponder was receiving the disputed treatments, the Ponders were covered by two successive certificates. From January 1, 1979-January 1, 1980, the Ponders claimed reimbursement under certificate "Non-group series G 2863." This 3-page, 11-part, 5,750-word contract contained two provisions of special relevance to this case. Under "General Provisions" part V, section E on page one of the certificate appears the following:

"E. *Other Providers of Care*: If the Member receives the services of a chiropractor, . . . or dentist performed within the scope of their licenses and payment for such services would have been provided under this Agreement if performed by a licensed physician, those services shall be treated as though they had been performed by a physician for the purpose of determining eligible benefits under this Agreement." On page two, under part VI, *General Limitations,* this certificate reads:

"Blue Cross shall not furnish benefits for:

". . . . . . . . . . . . . . . . . . . . . .

"J. *Dental Care*: Treatment on or to the teeth or gums or extraction of teeth except when necessitated by accident, or as otherwise specifically provided for under this Agreement; treatment of dental abscess or granuloma, treatment for or prevention of temporo-mandibular joint syndrome, treatment of gingival tissue other than for tumors, and dental examinations."

A new certificate, "Non-group series G-3823," became effective on January 1, 1980. This certificate modified the two key terms of the contract to read:

"D. *Other Provider of Care*

"If Benefits under this Agreement would have been provided for services performed by a physician, the same Benefits will be provided when those services performed by a licensed chiropractor, . . . or dentist operating within the scope of their license.

"Blue Cross shall Not furnish benefits for:

"J. *Dental Care*: Treatment on or to the teeth and gums or any tooth extraction except when it is required because of an accident occurring while the Member is covered under this Agreement. Treatment of dental abscess, granuloma, gingival tissues or dental examinations. Also, medical or surgical care for or prevention of temporo-mandibular joint syndrome or disease."

Blue Cross initially paid 4 of the 23 disputed claims totaling $742.48 which were filed during August 1979. Thereafter, Blue Cross paid no further claims for treating Mrs. Ponder's condition. On January 7, 1980, after issuance of the second certificate, Blue Cross sent a letter to the Ponders seeking return of the $742.48 already paid. Later that month, Mr. Ponder required emergency surgery. Blue Cross withheld $742.48 from the reimbursement it owed the Ponders for that bill for the express purpose of recouping the $742.48 it had paid out for Dr. Morgan's treatment of Mrs. Ponder's temporomandibular joint syndrome. At no time did Blue Cross seek return of payments made to the physician, Dr. Kulber, or to White Memorial Hospital for their diagnoses and treatment of Mrs. Ponder's temporomandibular joint syndrome.

At about this time, Mrs. Ponder was diagnosed as requiring surgery—a bilateral temporomandibular joint arthoplasty—and temporomandibular joint therapy. On September 17, 1980, the Ponders filed their complaint against Blue Cross seeking declaratory relief and damages. On October 20, 1981, the trial court heard defendant's motion for summary judgment and filed the following handwritten minute order: "Motion is granted; no triable . . .issues of fact as to exclusion; no waiver can be shown; no vagueness of the exclusion here; no contract of adhesion, moving party to prepare judgment."

The notice of appeal was filed December 10, 1981, and briefing completed March 28, 1983.

II. This Blue Cross Agreement Was an "Adhesion Contract" or a Standard Insurance Contract Aimed at the General Public and Thus Any Exclusions Must Be "Conspicuous" and "Plain and Clear"

In granting summary judgment, the trial court rested its decision on a finding that the language of the contract excluding coverage of "temporomandibular joint syndrome" was unambiguous. Since the court's decision was based primarily on its interpretation of the contract, rather than an appraisal of extrinsic evidence submitted by the parties, the usual deference to the trial court's findings of fact is not appropriate. "The interpre-

tation of a written instrument, even though it involves what might properly be called questions of fact . . ., is essentially a judicial function." Moreover, "[i]t is . . . solely a judicial function . . . unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].) It is the duty of an appellate court, as well as a trial court, to perform that function. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d at p. 866; *Pepper Industries, Inc.* v. *Home Ins. Co.* (1977) 67 Cal.App.3d 1012, 1018 [134 Cal.Rptr. 904].) As a consequence, we now undertake to conduct our own independent review of this contract.

The trial court apparently assumed that if the language of the exclusion is "unambiguous" in the sense of being precise, that ends the inquiry. Continuing the logic of the court's decision, *temporomandibular joint syndrome* is a precise term and was included in the exclusions section of the contract. The appellant was being treated for *temporomandibular joint syndrome.* Consequently she was not entitled to coverage.

We find it unnecessary to determine whether the phrase *temporomandibular joint syndrome* is indeed an "unambiguous" term.[1] Instead we subject

---

[1]The term *temporomandibular joint syndrome* is defined in Dorland's Medical Dictionary (25th ed., 1974) as a "dysfunction of the temporomandibular joint marked by a clicking or grinding sensation in the joint and often by pain in or about the ears, muscle tiredness and slight soreness upon waking, and stiffness of the jaw or actual trismus; it results from mandibular overclosure, condylar displacement, or stress, with deforming arthritis an occasional factor." (*Id.* at p. 1527.) "Temporomandibular," in turn, is defined as "pertaining to the temporal bone and the mandible." (*Id.* at p. 1546.) The temporal bone is "one of the two irregular bones forming part of the lateral surfaces and base of the skull, and containing the organs of hearing." (*Id.* at p. 219.) And the "mandible" is "the bone of the lower jaw." (*Id.* at p. 907.)

A leading text, Scopp, Oral Medicine (1973) describes some of the symptoms and causes of temporomandibular joint disorders more fully. "Organic disorders of the temporomandibular joint are similar to disorders of any other joints of the body . . . . Likewise, the type of pain in temporomandibular joint diseases is similar to afflictions of other joints. It consists of a steady dull ache of the joint with limited, painful movement . . . . Essentially, then, we are dealing with a pain-dysfunction syndrome similar to those found in other parts of the body.

". . . . . . . . . . . . . . . . . . . . . . .

"Temporomandibular joint disturbances are principally of traumatogenic, pathogenic, or psychogenic origin." (*Id.* at p. 154.)

Later in the chapter, the author defines traumatic causes to include externally generated fractures as from an automobile accident, dislocations, and traumatic occlusions. The pathogenic causes include traumatic arthritis—which itself can result "from a blow, . . . dental procedures, or even from overzealous endotracheal intubation"—osteoarthritis, rheumatoid arthritis, infectious arthritis, benign or malignant tumors, aplasia, hypoplasia, hyperplasia, rickets, vitamin C deficiency, hyperpituitarism and hypothyroidism. Psychogenic causes include anxiety and hysteria. (*Id.* at pp. 157-166.)

The author likewise points out: "Many temporomandibular joint disorders are not really true diseases of the joint itself but instead are muscular spasms. These contractures may be

this exclusion to two other tests which also must be satisfied before this contract term can be enforced against an insured. Because of the nature of the contract and the contracting parties, the most *precise* language imaginable may prove insufficient to eliminate coverage.

■ In order to understand why additional requirements apply to this contract, we first begin with the proposition that any contract is construed against the party who prepared the contract. (*Federal Leasing Consultants, Inc.* v. *Mitchell Lipsett Co.* (1978) 85 Cal.App.3d Supp. 44, 48 [150 Cal.Rptr. 82].) No one questions that Blue Cross prepared and printed this contract. Hence every term must be construed in favor of appellant. Secondly, this is not an ordinary contract, but an *insurance* contract which imposes an even more stringent duty on the court to interpret in favor of the insured. (*Schmidt* v. *Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 738 [74 Cal.Rptr. 367]; *Hays* v. *Pacific Indem. Group* (1970) 8 Cal.App.3d 158, 162 [86 Cal.Rptr. 815].) Thirdly, the contract term in dispute is an exclusion from coverage. ■ And an exclusion is subjected to the closest possible scrutiny. (*State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193 [110 Cal.Rptr. 1, 514 P.2d 953]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Cal. Comp. & Fire Co.* v. *Ind. Acc. Com.* (1965) 62 Cal.2d 532, 534 [42 Cal.Rptr. 845, 399 P.2d 381]; *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284]; *Pepper Industries, Inc.* v. *Home Ins. Co., supra,* 67 Cal.App.3d 1012, 1018.) Finally, we find this is not just an insurance contract but an adhesion contract for insurance.

■ True, the trial court explicitly found this was not an adhesion contract and thus applied the rules of construction for an ordinary contract. However, we do not agree this is an ordinary contract subject only to ordinary rules of construction. Health insurance agreements similar to this have been held to be adhesion contracts. (*Beynon* v. *Garden Grove Medical Group* (1980) 100 Cal.App.3d 698 [161 Cal.Rptr. 146].) ■ An adhesion contract is a standardized contract written entirely by a party with superior bargaining power. The weaker party to an adhesion must "take it or leave it," and be without opportunity to bargain. (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 882; *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 269; *Schmidt* v. *Pacific Mut. Life Ins. Co., supra,* 268 Cal.App.2d 735, 737; Note, *The Adhesion Contract of Insurance* (1964) 5 Santa Clara Law. 60; Note, *Contracts of Adhesion under California Law* (1967) 1 U.S.F. L.Rev. 306; Hurd and Bush, *Unconscionability: A Matter of Conscience for California Consumers* (1973) 25 Hastings L.J. 1, 32-73;

disguised as joint pain. Myofacial pain, usually unilateral, results from sustained contraction of the masseter, cervical, and temporal muscles. Accordingly, many temporomandibular joint disorders are pain-disfunction syndromes." (*Id.* at p. 155.)

Slawson, *Mass Contracts: Lawful Fraud in California* (1974) 48 So.Cal.L.Rev. 1; Sybert, *Adhesion Theory in California: A Suggested Redefinition and Its Application to Banking* (1978) 11 Loyola L.A. L.Rev. 297.) ■ This particular standardized contract was prepared entirely by a major insurance company whose bargaining power is clearly superior to individual members of the general public. Appellants were not at liberty to sit down with Blue Cross and bargain individual terms—to trade removal of an exclusion for a slightly higher premium, for example. If they wanted Blue Cross health insurance they had to sign the contract as is. Moreover, as this case itself illustrates, Blue Cross unilaterally changes the terms of the contract from year-to-year without consulting its policyholders.

■ Since we hold this is an adhesion contract, it is not enough the exclusionary clause could be deemed to be precise. It also must pass muster under two other independent tests. (1) The exclusion must be *conspicuous* and (2) the language of the exclusion must be *plain and clear.*[2] We have chosen to divide the traditional statement of the requirement that insurance policy exclusions be "conspicuous, plain and clear" into separate tests. As a matter of logic, this brief clause imposes two very different demands on those who draft insurance policies. First, the exclusion must be positioned in a place and printed in a form which would attract a reader's attention. Secondly, the substance of the exclusion must be stated in words that convey the proper meaning to persons expected to read the contract.

Nor is an explicit finding of an "adhesion contract" absolutely essential to the imposition of these two tests. Many of the appellate cases interpreting insurance contracts designed for the general public neither make nor require a specific finding the agreement constituted an "adhesion contract." (See, e.g., *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Stewart* v. *Estate of Bohnert, supra,* 101 Cal.App.3d 978; *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739 [161 Cal.Rptr. 322].) Without bothering to make that finding, the courts apply the special rules of interpretation ordinarily reserved for adhesion contracts. They scrutinize the provisions of these standardized insurance agreements to insure any exclusions or limitations on coverage meet the twin tests of being "conspicuous" and "plain and clear." (*Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d at p. 115 ["An exclusionary clause must be conspicuous, plain and clear."]; *Stewart* v.

---

[2]"If it (the insurer) deals with the public upon a mass basis, the notice of noncoverage of the policy, in a situation in which the public may reasonably expect coverage, must be conspicuous, plain and clear." (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 878; *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 273; *Stewart* v. *Estate of Bohnert* (1980) 101 Cal.App.3d 978, 988 [162 Cal.Rptr. 126].)

*Estate of Bohnert, supra,* 101 Cal.App.3d 978, 988; *Miller* v. *Elite Ins. Co., supra,* 100 Cal.App.3d 739, 751.)

One possible reading of these cases is that all standard insurance policies aimed at the general public are considered adhesion contracts per se since by definition they have the principal attributes of such agreements. Thus it is redundant to continually characterize them as adhesion contracts.[3] What is abundantly clear is that this issue is largely irrelevant. Whether characterized as an "adhesion contract" or as merely a "standard insurance contract marketed with the general public" this Blue Cross policy and its exclusions must pass all the tests ordinarily imposed on "adhesion contracts" in other contexts.

III. THIS EXCLUSION DISAPPOINTED THE INSURED'S REASONABLE EXPECTATIONS, IF THAT IS A PREREQUISITE TO OTHER REQUIREMENTS

It is not altogether clear that the *conspicuous* and *plain and clear* requirements apply unless the exclusion "disappoints the reasonable expectations" of the insured. Some cases couple the two statements in such a way as to suggest that only disappointed expectations will activate the conspicuous, plain and clear requirements. (See, e.g., *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 879; *Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562, 568-69 [83 Cal.Rptr. 394, 463 P.2d 746]; *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 267; *Hurd* v. *Republic Ins. Co.* (1980) 113 Cal.App.3d 250, 253 [169 Cal.Rptr. 675]; *Miller* v. *Elite Ins. Co., supra,* 100 Cal.App.3d 739, 752-753.) On the other hand, other decisions appear to require exclusions to comply with these requirements without any finding that implementation of the exclusion would "disappoint the reasonable expectations" of the insured. (See, e.g., *Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d 112; *State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193 [110 Cal.Rptr. 1, 514 P.2d 953]; *Safeco Insurance Co.* v. *Hale* (1983) 140 Cal.App.3d 347 [189 Cal.Rptr. 463].)[4] We can imagine exclusions which are so consistent with the scope of coverage an ordinary policyholder expects that it would be

---

[3]One commentator has observed that most agreements found to be adhesion contracts by California courts in fact have been insurance policies. Moreover, this same observer contends that in most other states the adhesion contract doctrine has been confined to insurance policies. (Sybert, *Adhesion Theory in California: A Suggested Redefinition and Its Application to Banking, supra,* 11 Loyola L.A. L.Rev. 297, 310.)

[4]Some of language in the leading case of *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862 suggests the California Supreme Court treats the unexpected nature of an exclusion as an independent and sufficient reason for striking the exclusion not as a prerequisite for requiring it to be conspicuous and clear. "In standardized contracts, . . . the California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable." (58 Cal.2d at p. 879.)

unnecessary if not redundant to impose special requirements these clauses be *conspicuous* and *plain and clear.* Nonetheless many, and perhaps most, exclusionary clauses by their very nature deny coverage that consumers otherwise would personally anticipate to be provided under the policy.

■ In any event, we have no difficulty holding the exclusion of coverage for *temporomandibular joint syndrome* clearly "disappoints the reasonable expectations" of the purchasers of these Blue Cross contracts. It is reasonable to expect a health insurance policy, especially one labelled a "High Option Performance Plan," to cover the costs of treating any condition which impairs one's health.

Temporomandibular joint syndrome clearly is such a condition. As the leading medical text cited earlier reminds us, "Organic disorders of a temporomandibular joint are similar to disorders of any other joints of the body . . . . Likewise the type of pain in temporomandibular joint diseases is similar to afflictions of other joints." (See fn. 1, *supra.*) There is no more reason for an insured to anticipate that diseases of the bone, muscles and tissues adjoining the temporomandibular joint would be excluded from coverage than that diseases of the knee joint or the elbow joint were excluded. Nor would there be any reason to expect that diseases which cause temporomandibular pain were excluded while diseases causing headaches or earaches were covered.

Certainly there was nothing special in Mrs. Ponder's situation which would alert her that *temporomandibular joint syndrome* was the sort of medical problem excluded from coverage under her Blue Cross policy. The initial diagnosis was made by a physician not a dentist. And this physician was treating her for symptoms related to her ears and head, not her teeth or gums. The physician, in turn, referred her to a hospital clinic not a dentist's office. A member of that clinic staff, who happened to be an oral surgeon but could have been a physician,[5] diagnosed and treated her. Neither the symptoms she was experiencing, the diagnosis she might have heard or read, nor the treatments she received had anything to do with her teeth or gums. Rather they were all consistent with the kinds of diseases of the bones, muscles, and nerves an ordinary person might reasonably expect to

---

[5]The average person could reasonably believe an oral *surgeon* is not a member of the dental profession but of the medical profession, especially when that special type of surgeon is affiliated with a hospital clinic not a dental clinic. But even if insureds realized they were being treated by a dentist, they could reasonably believe this was a covered treatment since it was the type of services which would have been eligible for payment if performed by a physician. As such, the dentist's treatment would be covered under the terms of part V, subsection E of the original contract.

be categorized as "medical" not "dental" and within the coverage of a normal health insurance policy, especially one designated as a "High Option Performance Plus Plan."

## IV. THIS EXCLUSION WAS NOT CONSPICUOUS

The *temporomandibular joint syndrome* exclusion appears under lettered subheading J within the category "General Limitations," which is section VI of the contract. It is conspicuous only in the sense that it contains the longest word in the entire body of the contract.[6] The page on which this brief exclusionary clause appears contains no less than 2,056 words, as well as 17 numbers and 54 letters designating headings and subheadings. This gives new meaning to the words "dense pack." True, this page cannot be characterized as a "sea of print" found objectionable in *Schmidt* v. *Pacific Mut. Life Ins. Co., supra,* 268 Cal.App.2d 735, 737. But that is only because it has been divided into 3 "rivers of print" by channeling the 2,056 words, 17 numbers and 54 letters into 3 columns. The section on "Exclusions from Coverage" alone packs 923 words into its slightly more than ⅓ page.

This is not to say that every exclusion contained in this Blue Cross contract must fail because of the density of its verbiage. That factor alone would not be enough to render an exclusion inconspicuous. But it does place a special burden on Blue Cross to highlight exclusions which an ordinary insured might not expect to be in a health insurance contract. The contract is dotted with provisions in boldface or all capitals. Generally these clauses address limitations or conditions on coverage which a policyholder might not anticipate. However, the *temporomandibular joint syndrome* exclusion is not accorded this treatment.

Not only is the *temporomandibular joint syndrome* exclusion in the ordinary 2,000 words per page print size, it appears as a clause in a paragraph labelled "Dental Care." That what everyone views as dental services—the care and treatment of teeth and gums—is excluded from a health insurance policy would surprise no one. Yet given the need to examine 913 fine print words of exclusion and the remaining 4,837 words of this contract, the average policyholder might well note the subheading "Dental Care Services" and skip over the detailed definition of that term. Indeed the rest of that definition is consistent with the ordinary dictionary definition of the term "dental," that is "of or relating to the teeth." (Webster's Third New

---

[6]One has to look to the partial listing of relative value studies units to find two longer words, "dascryocyslorhinotomy" (20 letters) and "procto-sigmoioscopy" (18 letters), and one of equal length, "parathyroidectomy" (17 letters). No attempt is made to define an exclusion from coverage with these technical terms, however.

Internat. Dict. (1981).) Without further notice, an average insured could scarcely anticipate a subparagraph labeled this way would contain an exclusion for a syndrome of possible conditions of the joint linking the jawbone and the skull and the complex of muscles, nerves and other tissues related to that joint.

This does not mean policyholders need never read beyond the boldfaced subheadings on the paragraphs which exclude coverage. But we do suggest it is difficult to characterize as "conspicuous" an exclusion which is located under a subheading whose ordinary meaning does not encompass the condition purportedly excluded. This problem is compounded when the exclusion is in no way differentiated from the remaining fine print and is part of a 5,750-word contract condensed onto 3 pages. *National Ins. Underwriters* v. *Carter* (1976) 17 Cal.3d 380 [131 Cal.Rptr. 42, 551 P.2d 362], on which Blue Cross relies, simply does not apply. Indeed here, unlike *National Ins.,* the bold face subheading ("Dental Care") actually misleads, rather than facilitates comprehension, while the fine print and overall length of the contract discourages discovery of the misplaced exclusionary clause. We are inclined to hold this exclusion invalid on the single ground it fails to meet the first test that it be "conspicuous." But there is an additional, more serious infirmity which is sufficient by itself to render the exclusion unenforceable against the Ponders.

V. The "Temporomandibular Joint Syndrome" Exclusion Was Not Plain and Clear

An exclusion in an adhesion contract of insurance must be expressed in words which are "plain and clear." This means more than the traditional requirement that contract terms be "unambiguous." Precision is not enough. Understandability is also required. To be effective in this context, the exclusion must be couched in words which are part of the working vocabulary of average lay persons.

"The policy should be read as a layman would read it . . . ." (*Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d 112, 115.) "The insurer bears a heavy burden to draft exclusionary clauses in clear language comprehensible to lay persons." (*Stewart* v. *Estate of Bohnert, supra,* 101 Cal.App.3d 978, 988.) The words must be such that "an ordinary layman can understand." (*Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 912 [109 Cal.Rptr. 473, 513 P.2d 353].) And an "insurer . . . is bound to use language clear to the ordinary mind." (*Migliore* v. *Sheet Metal Workers Welfare Plan* (1971) 18 Cal.App.3d 201, 204 [95 Cal.Rptr. 669].) (See also, e.g., *Gefrich* v. *State Farm Mut. Auto. Ins. Co.* (1980) 109 Cal.App.3d 500, 503 [166 Cal.Rptr. 516] [reduction in coverage must be

"in plain and understandable language"]; *S & H Ins. Co.* v. *California State Auto. Assn. Inter-Ins. Bureau* (1983) 139 Cal.App.3d 509, 515 [188 Cal.Rptr. 722] [policy limitation approved expressly because it was "phrased in clear and understandable language."].)

■ The test for a health insurance contract cannot be whether it is understood by physicians, dentists, or other health professionals. The terminology used must be comprehensible to the persons purchasing the insurance and expecting to receive the benefits they are paying for. Blue Cross is not targeting health professionals nor some highly educated segment of the population. Rather Blue Cross markets its standard policies to the general public. Consequently, these insurance contracts—and especially their exclusionary clauses—must be expressed in language comprehensible to citizens of average education, knowledge and experience.

■ On its face, the clause excluding coverage for *temporomandibular joint syndrome* scarcely appears "comprehensible to lay persons." It is a technical medical term which has meaning primarily for health professionals. True, it might be argued that some technical medical terms have entered the common lexicon. Pneumonia, carcinoma, and hernia[7] come to mind. But *temporomandibular joint syndrome* is not one of this select few. Indeed although the key word "temporomandibular" does appear among the 460,000 entries in the 2,752 pages of Webster's Third International Dictionary (1981), it is not mentioned among the over 100,000 entries and 1,000 pages of the more common college version of that dictionary. (Webster's New Collegiate Dict. (1980).) Nor does it appear among the over 100,000 entries in the more than 1,000 pages of The American Heritage Dictionary (2d ed. 1982) nor the 170,000 entries and 1,568 pages of the Random House College Dictionary (rev. ed. 1982). A fortiori, this term is not one which ordinary human beings with average vocabularies can be held accountable to know.

Significantly, Blue Cross has chosen to define 21 words and phrases used in this contract. *Temporomandibular joint syndrome* is not one of these. Moreover, the contract provides plain language translations of other technical medical terms such as "blepharoplasty," "meloplasty," "mammoplasty" and even "surgery." But again *temporomandibular joint syndrome* is left undefined.

---

[7]See, e.g., *Pendell* v. *Westland Life Ins. Co.* (1950) 95 Cal.App.2d 766, 773 [214 P.2d 392] where "hernia" was "construed in its popular sense . . . as an average person, with usual and ordinary intelligence, would understand it, rather than in its technical or scientific sense . . . ." "Temporomandibular joint syndrome," in contrast to "hernia," has no popular meaning only a "technical or scientific" meaning. The "average person, with usual and ordinary intelligence," would simply not understand the term.

We have found no California cases which squarely consider the specific issue of whether undefined technical terminology or other unfamiliar words can satisfy the "plain and clear" test. Several cases mentioned earlier have insisted that any exclusion be couched in language which is "comprehensible to lay persons" or "clear to the ordinary mind." Yet none of these California cases have confronted contracts which used uncommon words to exclude coverage. Rather they have disapproved the confusing arrangement of common words. If the unusual arrangement of common words can render an exclusionary clause incomprehensible and thus unenforceable surely an exclusionary clause which derives its entire meaning from unusual words is at least equally incomprehensible and therefore unenforceable.

Furthermore, our research did uncover a recent case from another jurisdiction specifically addressing the use of an uncommon word in an insurance contract. In *Read* v. *Western Farm Bur. Mut. Ins. Co.* (1977) 90 N.M. 369 [563 P.2d 1162], the Court of Appeals of New Mexico reversed a summary judgment which had been granted in favor of the insurance company in part because it found a single three-letter word in the policy was not "ordinarily used in the common speech of men and women." The word in dispute was "nil." The New Mexico high court reasoned:

"The trial court below and this Court understand the meaning of the odd contracted Latin word 'NIL' as used in the policy, and we know that coverage of medical payments, limited to premises and employees, does not cover medical payments for the named insured and family, but we must not impose this knowledge on the public. When we say that a word will be given its ordinary meaning, we do not include 'odd' words, peculiar words, contracted words, Latin words, or words that are not a part of speech or writing. *We mean words ordinarily used in the common speech of men and women.* . . .

"The word 'NIL' did not communicate to plaintiff that medical expense coverage was omitted. *A word that an insured cannot understand is a word of doubtful meaning and ambiguous* . . . . [W]e have adopted a realistic doctrine. An insurance company has a duty to make policy provisions and words therein, especially those related to coverage, *plain, clear and prominent to laymen.* . . . [W]e cannot say as a matter of law that the word 'NIL' is plain, clear and unambiguous to plaintiff." (Read v. Western Farm Bur. Mut. Ins. Co., supra, 563 P.2d at 1166-1167.) (Italics supplied.)

We note that the New Mexico high court imposes on insurance contracts a "plain, clear and prominent" test nearly identical to the "plain, clear and conspicuous" standard applied in California. If the one syllable, three-letter word "nil" is not deemed "plain and clear" to the average New Mexican,

we are loath to hold our educational system so superior or the average I.Q. of our citizens so much higher that the seven syllable, seventeen-letter word "temporomandibular" is "plain and clear" to the average Californian. It would be difficult to locate a dictionary that failed to define the word "nil." As we have observed earlier, it is nigh impossible to find one that *does* define the word "temporomandibular." If "nil" fails the "plain and clear" test because it is not a word "ordinarily used in the common speech of men and women" then a fortiori "temporomandibular joint syndrome" flunks that test.

Respondent's counsel was asked at oral argument why this exclusion had not been expressed in plain English, comprehensible to the average policyholder. Counsel replied that temporomandibular joint syndrome embraced too many conditions to define in ordinary language, some of which were covered under the policy and some of which were not. This response only serves to highlight the term's failure to supply a "plain and clear" warning of what was excluded.[8]

VI. THE COMPREHENSIBILITY OF AN EXCLUSION MUST BE JUDGED AS OF THE TIME THE INSURANCE CONTRACT IS ACCEPTED

Admittedly, once a policyholder went to a physician or oral surgeon, she might be informed she had *temporomandibular joint syndrome* by the health professional familiar with this technical terminology. If clairvoyant or inherently suspicious, she might even think to reexamine the 5,750 words in her policy to determine whether that condition was covered.

Indeed Blue Cross relies heavily on a comment in Mrs. Ponder's response to interrogatories to the effect she is suffering from "TMJ syndrome." According to Blue Cross this evidences that Mrs. Ponder knows she has "TMJ syndrome." "TMJ syndrome," the argument continues, is an abbreviation of "temporomandibular joint syndrome." "Temporomandibular joint syndrome," in turn, is excluded from coverage under Mrs. Ponder's Blue Cross contract. Accordingly, Mrs. Ponder is seeking payment for treatments of a disease she knew was excluded from coverage.

One might quarrel with whether acknowledging one has "TMJ syndrome" necessarily means one knows she is suffering from "temporomandibular joint syndrome." But setting that problem aside, there is a problem with Blue Cross' reasoning. Mrs. Ponder learned she had temporomandi-

---

[8]Indeed one might infer from this reply that temporomandibular joint syndrome is an inherently ambiguous term and thus does not even satisfy the traditional requirement that exclusionary language be precise. However, we do not reach that issue since we find the term is not "plain and clear" even if it is unambiguous in the sense of being precise.

bular joint syndrome, if at all, when her doctor diagnosed that condition many months after the Ponders accepted the Blue Cross contract.

Respondent's counsel was unable to cite, and we have been unable to locate, any cases suggesting health insurance policy holders are under some duty to check the policy language each time a new disease is diagnosed to determine whether it is indeed covered under the policy. Nor was counsel able to cite, nor have we been able to find, any cases holding the "plainness and clarity" of an exclusion are to be judged as of the time the disease is diagnosed rather than when the contract is executed.

We fully understand the absence of authority on both of these propositions. To adopt rules of this nature would turn every health insurance policy into a trap for the consumer. Coverage could be defined and exclusions stated in technical terms which held no meaning for the average citizen. Policyholders could only discover what they had bought with their premiums as their diseases were diagnosed and they found out, often to their sorrow, the true meaning of those mysterious words in their health insurance contracts.

■ Thus the fact that Mrs. Ponder may have been informed by her physician, the White Memorial Hospital Clinic, or the staff oral surgeon from this clinic who treated her that she had "TMJ syndrome" (or even if they translated this abbreviation into the full technical term, "temporomandibular joint syndrome" used in the Blue Cross contract), that information comes too late to exclude her from coverage for treatment of temporomandibular joint syndrome.

■ The critical time for judging whether an exclusion is "plain and clear" is at the time the insured accepts the contract not when the incident triggering coverage first arises. ■ There is nothing in the record on which this summary judgment was based indicating that anyone from Blue Cross attempted to explain the plain language meaning of *temporomandibular joint syndrome* to appellant or her husband before they accepted the contract. Nor is there any extrinsic evidence that either of them appreciated the meaning of the term at that time because of some special knowledge in their background.

## VII. CONCLUSION

■ We hold the contract between Blue Cross and the Ponders was both an adhesion contract for insurance and a standard insurance contract marketed with the general public, if there is any difference. Whichever of those characterizations applies, any exclusion from coverage must be presented

in such a manner that it is *conspicuous* to the reader. The exclusion also must be stated in language which is *plain and clear* in the sense it is "comprehensible to lay persons" including the use of words which are part of the working vocabulary of average lay persons.

■ We hold that the *temporomandibular joint syndrome* exclusion in the Blue Cross contract fails the *conspicuous* test because of its placement, its fine print and the density of the entire contract. Whether that alone would be sufficient to rule this exclusion ineffective we need not decide. Instead we hold this exclusion also fails the *plain and clear* test because the *undefined* technical terminology is not calculated to be part of the working vocabulary of average lay persons. This defect would have been sufficient by itself to invalidate the exclusion. Moreover, in combination, and under the circumstances of this case, these two infirmities are enough as a matter of law to render this clause ineffective to exclude coverage for the services rendered Mrs. Ponder in this case.

We diagnose the exclusion in this contract to suffer from "complexified occultation clause syndrome." That malady alone is fatal and thus we need not rule on other possible infirmities. Accordingly, we find it unnecessary to reach the question of whether the term *temporomandibular joint syndrome* is inherently ambiguous in the sense of being imprecise or whether its placement under the subheading "Dental Care" renders it ambiguous in that same sense. We likewise find it unnecessary to consider whether Blue Cross waived the exclusion by paying physicians and hospitals for their services in connection with Mrs. Ponder's temporomandibular joint syndrome.

### DISPOSITION

The summary judgment in favor of respondent Blue Cross is reversed. The action is remanded for further proceedings consistent with this opinion.

Schauer, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied August 30, 1983, and on August 31, 1983, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied September 29, 1983.