[No. D013743. Fourth Dist., Div. One. Apr. 27, 1992.]

BRUCE ALEXANDER SHEPARD, an Incompetent Person, etc., et al.,
Plaintiffs, Cross-defendants and Appellants.
CALFARM LIFE INSURANCE COMPANY, INC., et al., Defendants,
Cross-complainants and Respondents.

## Counsel

Thorsnes, Bartolotta, McGuire & Padilla and Daral B. Mazzarella for Plaintiffs, Cross-defendants and Appellants.

Crosby, Heafey, Roach & May, James C. Martin, Stephen A. McFeely and Marilyn A. Moberg for Defendants, Cross-complainants and Respondents.

## Opinion

**HUFFMAN, J.**—Bruce Alexander Shepard, through his guardian ad litem and wife Catherine E. Shepard, and Mrs. Shepard (the Shepards) appeal the judgment granting declaratory relief in favor of defendant and respondent CalFarm Life Insurance Company (CalFarm) to the effect that a Medicare supplement provision in the Shepards' health insurance policy, transferring them to a different plan, was enforceable and the Shepards were not entitled to continued health care coverage as they claimed. Because the trial court found no breach of contract on the part of CalFarm, the Shepards' remaining causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing were found to be moot and judgment was entered accordingly.

Pursuant to our duty to construe the documents containing these policy provisions independently as a matter of law, we have concluded the Medicare supplement provision is ambiguous and thus must be construed against the insurer, resulting in the provision of coverage to the Shepards under their existing policy, Plan P. We also conclude the reduction in policy coverage purportedly effected by the transfer provision was not sufficiently clear and conspicuous to be enforceable. Accordingly, we reverse the judgment with directions to the trial court to rule in favor of the Shepards as to declaratory relief, and to entertain further proceedings on the remaining causes of action.

### Factual and Procedural Background

The essential facts were not disputed and were presented for resolution by court trial of the declaratory relief cause of action. Documentary evidence, including the various certificates of coverage issued to the

Shepards by CalFarm, representing several versions of their comprehensive medical expense and life insurance coverage, was introduced at the time of trial.[1]

The Shepards first purchased medical insurance from CalFarm in 1978, in the form of Plan NP ("new participant"). A year later, they became covered under CalFarm's policy Plan A. During their coverage under Plan A, plaintiff Bruce Shepard, at the age of 36, suffered a catastrophic and disabling injury when his three-wheel all-terrain vehicle overturned. He suffered a severe closed head injury with residual effects, including cognitive deficits, speech impediment, hemipariesis, incontinence, and behavioral and emotional changes. He is unable to function outside of an institutional setting, where he will require skilled nursing care for the remainder of his life.

In 1986, the Shepards changed their coverage from Plan A to a comprehensive medical expense and life insurance coverage known as Plan P.[2] CalFarm paid benefits of over $300,000 for the Shepards under Plans A and P between February 1985 and September 1988. Mr. Shepard began receiving Medi-Cal benefits in late 1986 or early 1987. In December 1988, CalFarm learned that Mr. Shepard's disability had rendered him eligible for Medicare as of August 1987.[3]

Upon learning of Mr. Shepard's Medicare eligibility, CalFarm notified the Shepards it was invoking a provision of the Plan P certificate of insurance, the "PLAN B MEDICARE SUPPLEMENT." This provision (the transfer provision) reads as follows:

"When a Member or Dependent becomes eligible for coverage under Medicare, his or her medical coverage . . . will automatically be transferred

---

[1]On a technical note, the certificates of insurance issued to the Shepards were subject to the master policies held by their group, the California Farm Bureau. For our purposes, the certificates of insurance are the only information provided to the policyholders, and constitute the policy of insurance which we must interpret here. (*Bareno v. Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 881-882 [103 Cal.Rptr. 865, 500 P.2d 889].)

[2]The Plan P certificate of insurance which the Shepards received is attached to their complaint as exhibit C and was admitted at trial in two versions as exhibits 5 and 6. (Since the exhibits were released to counsel after trial, in this opinion we have referenced the version that was supplied us by the Shepards.) Plan P is also identified as Plan P250, to identify the deductible selected. For simplicity, our discussion will focus on trial exhibit 6, the version of Plan P which was in force at the time of CalFarm's alleged breach of contract and breach of the implied covenant of fair dealing, December 1988. The language contained in all versions of Plans A and P in effect over the period of the Shepard's coverage is essentially the same as to the pertinent provisions.

[3]Medicare benefits, paid pursuant to title XVIII of the Social Security Act, provide federal health insurance for the aged and disabled. (42 U.S.C. §§ 416i, 426b, 1395c.) Such benefits include inpatient hospital services and extended care services for up to 150 days per year. (42 U.S.C. § 1395d (July 1, 1988 amend.).)

to Plan B on the date he or she becomes eligible for coverage under Medicare. A premium adjustment will be made to reflect such change in coverage."

This transfer provision appears under its own separate capitalized heading, "PLAN B MEDICARE SUPPLEMENT,"[4] immediately after a list of 11 items under a similarly printed heading, "WHEN COVERAGE TERMINATES." Item number 11 in the termination section states:

"Coverage of any Member or Dependent under this Plan automatically terminates on the earliest of the following dates: [¶] . . . [¶] 11. *With respect to Life insurance*, the first day of the month in which the Member becomes eligible for Medicare." (Italics added.)

The Plan P certificate booklet contains an advisement on an introductory page that the insured should "read this Certificate carefully to learn the important details of the coverage provided." Plan P also includes a number of other standard provisions, such as an "EXCLUSIONS AND LIMITATIONS" section, excluding inter alia payment of benefits for treatment of injuries or illnesses covered by worker's compensation. A "COORDINATION OF BENEFITS" section was included, providing for a reduction in benefits if a covered person had any other coverage paying medical benefits, so that no more than 100 percent of covered charges could be received. Under Plan P, maximum lifetime benefits of $1 million were allowed, including 180 days' skilled nursing care coverage. Finally, the Plan P certificate booklet referred to Medicare eligibility under the section entitled "Who Is Eligible to Join Plan [P250] and When?" The relevant requirement said one must not "be eligible for coverage under Medicare at the time application for this coverage is made . . . ."

Although the transfer provision refers to Plan B as providing the transferred coverage, no copy of Plan B was attached to or incorporated into the Plan P policy. It is not disputed that the Shepards did not receive copies of the Plan B policy materials until after CalFarm had notified them that it was transferring their coverage to Plan B.

In the wake of CalFarm's notification to the Shepards that it was transferring their coverage to Plan B, Mrs. Shepard and her children obtained other

---

[4]In the Shepards' earlier Plan A certificate booklet, the information about the "automatic transfer" of coverage to Plan B upon eligibility for Medicare appears as a separate paragraph under the general heading, "WHEN COVERAGE TERMINATES." However, in the Plan P policy which was in effect at the time that CalFarm made its decision to "transfer" coverage, the Medicare supplement transfer language is included under its own separate heading of the same size type, after the "WHEN COVERAGE TERMINATES" section.

insurance coverage. On April 24, 1989, the Shepards filed this action for compensatory and punitive damages for breach of contract and breach of the implied covenant of good faith and fair dealing, also seeking declaratory relief. Generally, the Shepards contended they were entitled to continued coverage under Plan P and the "transfer" to Plan B was ineffective. CalFarm responded with an answer and a cross-complaint for declaratory relief seeking recovery of the amounts it had allegedly overpaid to the Shepards ($11,493.52) after Mr. Shepard's Medicare eligibility.

At trial, the parties agreed the dispute over the enforceability of the transfer provision should be tried first. The trial court admitted by agreement of the parties, without objection or limitation, eight exhibits which comprised the certificate booklets explaining the coverage, including Plans NP, A, P, and B. Although Plan B had not been made available to the Shepards before CalFarm notified them it intended to enforce the transfer provision, the Shepards submitted the Plan B certificates to the trial court to demonstrate there was a difference in coverage between Plans P and B. Under Plan B, the lifetime maximum payment was $250,000 (not $1 million), and skilled nursing care was limited to not more than 100 days under the terms of trial exhibit 7, page 3.

Other evidence submitted at trial included exhibit 17, a letter from CalFarm's vice president and general counsel Broderick to Shepard's counsel. The letter explained it was CalFarm's practice, when advised of Medicare eligibility, to immediately terminate coverage on the non-Medicare plan, retroactive to the insured's eligibility date under Medicare. Other exhibits admitted included numbers 43 and 44, various versions of the master policies, GH-1000, between the Farm Bureau and CalFarm. The Shepards' attorney objected on the grounds that the Shepards had never seen these master policies before this litigation was initiated. However, the court admitted the master policies in order to take a look at them, although it stated it realized that material was peripheral to plaintiffs' position.[5]

Counsel then argued their respective positions to the trial court, which rendered its decision the following day. The trial court ruled in favor of CalFarm with respect to the declaratory relief cause of action. It reasoned, first, the language concerning automatic transfer of coverage to Plan B upon Medicare eligibility was found in the Plan A booklet under the heading of

---

[5]Another evidentiary dispute arose when the Shepards attempted to introduce exhibit 16, a memo from an unidentified employee of CalFarm, reflecting notes made in response to questions of CalFarm by plaintiffs' insurance broker, Rick Hanson. Plaintiffs' theory was that this memo demonstrated confusion on the part of Hanson about the effect of Bruce Shepard's Medicare eligibility. The court kept this exhibit out upon CalFarm's objections of hearsay, prejudice under Evidence Code section 352, and irrelevance.

"WHEN COVERAGE TERMINATES." However, in Plan P, the court noted, the announcement concerning automatic transfer was found in a separate bold-faced subheading immediately following the termination of coverage section. The court observed:

"There is no question to me that a layperson reading that provision and reading that sentence should understand Plan B [*sic*] is no longer available to them upon the eligibility for coverage under Medicare."

The trial court concluded the Plan B certificates clearly revealed their obvious sole purpose was to coordinate with Medicare. Several specific findings are set forth in the reporter's transcript: (1) The automatic transfer to Plan B constituted a reduction in coverage, which was clearly and plainly set forth in the policy; (2) the use of the words "transfer to Plan B" was clear and unambiguous; (3) the transfer language adequately put the insured on notice that he or she was no longer eligible for the benefits of either Plan P or Plan A after the "automatic transfer" to Plan B. The court explained, "The loss of benefits under Plan [P]250 is the 'only reasonable interpretation,' . . . of the language in my opinion."

Therefore, declaratory relief was issued that the Shepards were not entitled to further policy benefits under Plan P after Mr. Shepard became eligible for Medicare, and the causes of action for breach of contract and the implied covenant of good faith and fair dealing were found to be moot. However, the court declined to grant CalFarm's request in its cross-complaint that the allegedly overpaid benefits be refunded. Judgment was prepared and entered accordingly and the Shepards appeal.[6]

## DISCUSSION

The Shepards attack the judgment for declaratory relief on several fronts. First, they claim the trial court's determination that the transfer provision was not ambiguous is erroneous for several reasons: the provision is subject to more than one reasonable interpretation, it is illogically located and labeled within the policy certificate as a whole, and it is inconsistent with other provisions of Plan P. In a related argument, they claim the reduction in coverage sought to be accomplished by the transfer provision is invalid for lack of clarity and conspicuousness within the policy language.

█ It is our judicial function as an appellate court to independently review the language of these written instruments to interpret the contract.

---

[6] CalFarm has dismissed its cross-appeal from the judgment in favor of cross-defendants Shepard on the cross-complaint.

(*Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 716-717 [193 Cal.Rptr. 632]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ The certificates of insurance provided to the Shepards constitute the insurance policy and are binding on the insurer. (*Bareno* v. *Employers Life Ins. Co., supra,* 7 Cal.3d 875, 881-882.)

■ "It is a basic principle of insurance contract interpretation that doubts, uncertainties and ambiguities arising out of policy language ordinarily should be resolved in favor of the insured in order to protect his *reasonable* expectation of coverage. [Citations.] It is also well established, however, that this rule of construction is applicable only when the policy language is found to be unclear. [Citations.] ' "A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citation.]' [Citation.] Whether language in a contract is ambiguous is a question of law. [Citation.] We are also guided by the principle that words in an insurance policy must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the policy language. [Citation.]" (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].)

Where insurance policy language is ambiguous, " 'the burden in such a case as this is on the defendant to establish that the words and expressions used not only are susceptible of the construction sought by defendant but that it is the *only* construction which may fairly be placed on them.' [Citation.]" (*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 875 [27 Cal.Rptr. 172, 377 P.2d 284], original italics.) Moreover, internal inconsistency between policy provisions may result in ambiguity. (*Holz Rubber Co., Inc.* v. *American Star Ins. Co.* (1975) 14 Cal.3d 45, 56-58 [120 Cal.Rptr. 415, 533 P.2d 1055, 79 A.L.R.3d 518].)

In *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 879, the Supreme Court expressed the view:

"In standardized contracts, . . . which are made by parties of unequal bargaining strength, the California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable." (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d at p. 879.)

In all material aspects, the transfer provision in this case may be viewed as a clause limiting liability under the policy, similar to an exclusionary clause. ■ Exclusionary clauses are required to be precise in their

language, must be conspicuous within the policy, and must contain language which is plain and clear. (*Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d at p. 719.) In *Ponder, supra,* the court stated the following test:

"First, the exclusion must be positioned in a place and printed in a form which would attract a reader's attention. Secondly, the substance of the exclusion must be stated in words that convey the proper meaning to persons expected to read the contract." (*Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d at p. 719.)

We shall consider the Shepards' claims that this policy provision was both ambiguous and inconspicuous in connection with each of their particular arguments: the clause is subject to more than one reasonable interpretation, it is illogically located and labeled within the policy, and it is inconsistent with other provisions of Plan P.

I

At trial, the Shepards took the position that they were entitled to continued coverage under Plan P, coordinated with Medicare, rather than the coverage which CalFarm claimed existed, Plan B coordinated with Medicare. The Shepards' main argument was that the transfer language of the Medicare supplement provision could not reasonably be interpreted to mean that Plan P coverage would actually be terminated through the "transfer" to a different coverage, Plan B. They rely on the dictionary definition of "transfer" as not including the "termination" concept: "To convey or remove from one place, person, etc. to another . . . ." (Random House Dict. of the English Language (2d ed. 1987) p. 2009.) They argue that if the transfer provision is effective to terminate Plan P coverage through the transfer of coverage to Plan B, that provision should have been included in the "WHEN COVERAGE TERMINATES" heading of the policy. Under that heading, they point out, it is specified that coverage under Plan P shall terminate "with respect to life insurance" upon Medicare eligibility. They claim that if a similar result were intended with respect to medical coverage, it should have been more clearly specified, and that the separate heading entitled "PLAN B MEDICARE SUPPLEMENT PROVISION," following the "WHEN COVERAGE TERMINATES" heading, was inadequate to accomplish the task.

We agree with the Shepards that the language of the transfer provision is ambiguous and is subject to more than one reasonable interpretation as to the effect of the provision on coverage, due to the use of the term "transfer" in that context. However, we think the Shepards make an even stronger argument: no copy of the Plan B booklet was ever supplied to them before the

transfer notification was given. None of the policy certificates for Plans NP, A, or P included any attachment or endorsement showing what the provisions of Plan B were concerning coverage. Although the introductory page of Plan P directs the insured to "read this certificate carefully to learn the important details of the coverage provided," no details of the coverage to be provided under Plan B, if a transfer were to be made, were supplied within or incorporated into Plan P. The Shepards strongly argued this point to the trial court:

"So when the insured reads the certificate, they think they've got an outline of the coverage. Well, clearly, to the extent that Plan 'B' can come along and automatically be thrust upon the insured, they are not informed of the coverage that they are purchasing."

This defect in the Plan P certificate renders it ambiguous. Under Insurance Code section 10113,[7] a life or disability insurance policy is deemed to constitute the entire contract between the parties, "and nothing shall be incorporated therein by reference to any . . . writings, of either of the parties thereto or of any other person, unless the same are indorsed upon or attached to the policy . . . ."[8] In *Wernecke* v. *Pacific Fidelity Life Ins. Co.* (1965) 238 Cal.App.2d 884, 888 [48 Cal.Rptr. 251], this court applied section 10113 to find that an insurance policy contained an inherent uncertainty when it provided that the company must be satisfied the applicant " 'was insurable under the Company's rules,' " where those rules were not disclosed to the applicant by endorsement or attachment to the receipt for the insurance policy. The court found that "the clarity of expression required in insurance transactions" was not satisfied by such an omission, and reversed a judgment of nonsuit that had been awarded to the insurer.

Here, it was not disputed that different coverage was provided by Plans P and B. For example, although Plan P included a $1 million lifetime maximum benefit and 180 days skilled nursing care per year, Plan B provided a $250,000 benefit maximum and 100 days of skilled nursing care per year. "Transfer" to Plan B thus had ramifications of which the insured was entitled to be notified at the time that the policy was purchased. ▮ "The critical time for judging whether an exclusion is 'plain and clear' is at the time the insured accepts the contract not when the incident triggering coverage first arises." (*Ponder* v. *Blue Cross of Southern California*, *supra*, 145 Cal.App.3d

---

[7] All statutory references are to the Insurance Code unless otherwise specified.

[8] Section 10113 applies by its terms to every policy of life and/or disability insurance. Under section 106, disability insurance includes insurance against injury, disablement, or death resulting to the insurer from accidents, as was the case for Mr. Shepard. Therefore, it appears that section 10113 applies to the comprehensive medical expense and life insurance coverage that we consider in this case. The parties have not argued otherwise.

709, 727.) ■■■ On the face of the Plan P policy, the consequences of being "automatically . . . transferred to Plan B" upon Medicare eligibility are not made clear.

Accordingly, we conclude this policy provision is subject to more than one reasonable interpretation, and as such must be construed against the insurer. (*Steven* v. *Fidelity & Casualty Co.*, *supra*, 58 Cal.2d 862, 875.) Such an ambiguity arising out of policy language will be "resolved in favor of the insured in order to protect his *reasonable* expectation of coverage." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.*, *supra*, 41 Cal.3d at p. 912.) ■■■■■■ As of the time of the purported "transfer" to Plan B, Plan P remained in force as to the Shepards, subject to its coordination of benefits provision. (See pt. III, *post*.)[9]

## II

■ *Ponder* v. *Blue Cross of Southern California*, *supra*, 145 Cal.App.3d 709, 719 teaches that insurance policy clauses which limit or exclude liability must be so positioned and printed in the policy in a form which would attract the reader's attention, and must state the substance of the exclusion "in words that convey the proper meaning to persons expected to read the contract." (*Ibid.*) The transfer provision here sought to exclude or limit liability for coverage under Plan P for Medicare-eligible persons. However, it does so in an obscure fashion. Its separate heading in the same typeface as the preceding "WHEN COVERAGE TERMINATES" heading makes unclear the relationship of the Medicare supplement provision to the termination provision. As explained above, the language in this provision that an

---

[9]In the Shepards' complaint, they allege as one of their theories of breach of the insurer's duty that CalFarm failed to explain to them the possibility of conversion of their comprehensive medical expense coverage under Plan P to a Plan B Medicare supplementation. Under *Malcom* v. *Farmers New World Life Ins. Co.* (1992) 4 Cal.App.4th 296 [5 Cal.Rptr.2d 584], it is clear that an insurer has no duty to point out and explain an unambiguous and conspicuous provision of a policy (there, a suicide provision in a life insurance policy). This authority is not applicable here, since we find the transfer provision was in fact ambiguous and inconspicuous.

Moreover, CalFarm is incorrect when it characterizes the record as showing that the Shepards' attorney conceded at trial that CalFarm had no obligation to explain what would happen when the coverage was transferred to Plan B. The Shepards' counsel agreed with the trial court that if a limitation or a reduction provision in a policy that disqualified an insured from a particular plan (but did not explain what plan he did qualify for) was conspicuous and plain, an insurer would be entitled to enforce such a provision. However, plaintiffs' counsel insisted that those were not the circumstances of this case, where the transfer provision was claimed to be ambiguous and inconspicuous. We therefore decline to view the Shepards' argument (that CalFarm had a duty to reveal the contents of Plan B at the time the insurance contract was entered into) as one which is newly raised on appeal. (See *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

insured "will automatically be transferred to Plan B on the date he or she becomes eligible for coverage under Medicare," does not reveal the consequences of such a transfer, i.e., a reduction in coverage through newly imposed coverage under an entirely different plan.

We cannot find this provision is positioned and printed in a form which would adequately attract a reader's attention, or is stated in words that convey the proper meaning, withdrawal of the original coverage, to the expected reader. (*Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d 709, 719; *Fields* v. *Blue Shield of California* (1985) 163 Cal.App.3d 570, 579 [209 Cal.Rptr. 781].)

### III

In conclusion, the Shepards argue the transfer provision is inconsistent with other provisions of Plan P. (*Holz Rubber Co., Inc.* v. *American Star Ins. Co., supra,* 14 Cal.3d 45, 56-58.) Specifically, they point out that the initial eligibility requirements for Plan P exclude persons then eligible for Medicare, but do not refer to any consequences of any later-occurring eligibility, such as disqualification from coverage and transfer to a different plan. They also question how the Plan P $1 million maximum benefits provision can be reconciled with an automatic transfer of a disabled insured to a Medicare supplement plan, since such a disabled person might be presumed to have the most obvious need for such a large maximum benefit. These discrepancies point up the ambiguity of the current wording of the transfer provision.

Moreover, CalFarm showed through its "Exclusions and Limitations" section of Plan P that it had the capability of clearly specifying the consequences of an insured's receipt of medical care which is covered under a government program, such as any worker's compensation law or act. However, CalFarm failed to set forth in unambiguous, clear and conspicuous terms the consequences of an insured's eligibility for Medicare during the period of coverage under the comprehensive medical insurance plan.

Finally, Plan P includes a "Coordination of Benefits" provision, stating:

"Benefits payable hereunder are subject to reduction, . . . if the Covered Person has other coverages (not including individual coverage) providing hospital, surgical, medical or dental benefits. Such reduction will preclude the Covered Person's receiving an aggregate of more than 100 percent of Covered Charges from all group coverages." At trial, the Shepards' counsel

conceded they were not entitled to a double recovery of full Plan P benefits plus Medicare coverage; public policy forbade such a result. The Shepards instead sought to have Plan P coverage, not Plan B, coordinated with Medicare.

Even though Plan P is not by its terms a "Medicare supplement plan," its coordination of benefits section is consistent with the provisions of section 10194.2, subdivision (d), found in the article regulating insurance to supplement Medicare, and providing in full: "No Medicare supplement insurance policy or certificate in force in California shall contain benefits which duplicate benefits provided by Medicare." Thus, the Plan P policy must be interpreted to allow Medicare benefits to be coordinated with the provision of CalFarm benefits.

Accordingly, our independent review of the insuring agreement requires us to reverse the judgment for declaratory relief. The trial court is directed to rule in favor of the Shepards as to declaratory relief, and to entertain further proceedings on the remaining causes of action.[10]

## Disposition

The judgment is reversed with directions to rule in favor of the Shepards as to declaratory relief. The matter is remanded for further proceedings on the remaining causes of action. Costs to appellant.

Wiener, Acting P. J., and Benke, J., concurred.

---

[10]Our resolution of the policy interpretation questions presented makes it unnecessary for us to address the Shepards' claims of evidentiary error.