[Nos. A088368, A088539. First Dist., Div. Four. Feb. 27, 2001.]

RICHARD VAN NESS, Plaintiff and Appellant, v.
BLUE CROSS OF CALIFORNIA, Defendant and Respondent.

366

## COUNSEL

John M. Riestenberg for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Kurt C. Peterson, James C. Martin, Denise M. Howell and Stuart Shanus for Defendant and Respondent.

## OPINION

**REARDON, Acting P. J.**—In 1991 appellant Richard Van Ness purchased health insurance from respondent Blue Cross of California under its prudent buyer program. That program established a two-tiered benefit schedule—the negotiated fee schedule for participating providers and the limited fee schedule for nonparticipating providers. Benefits under the negotiated fee schedule were greater because network providers agreed to cap their fees for Blue Cross subscribers. Van Ness's treating physician was not part of the prudent buyer network.

When the benefits Blue Cross paid for colonoscopy surgery amounted to just over one-third of his doctor's actual fee, Van Ness sued Blue Cross asserting multiple causes of action. He lost on summary judgment. We conclude that the Blue Cross policy and promotional materials were not ambiguous and did not support an objectively reasonable expectation that the insurer would pay enhanced benefits beyond those available under the limited fee schedule; nor did the limited fee schedule amount to an exclusion from coverage. Thus there is no legally cognizable basis to afford Van Ness relief. Accordingly, we affirm the judgment.

## I. FACTUAL BACKGROUND

### A. *Development of Prudent Buyer Plan*

In 1982 California enacted legislation permitting insurers to contract with hospitals and health care professionals to provide services to insureds at a fixed or "alternative" rate. (See Ins. Code,[1] § 10133, subds. (c)-(e), as amended by Stats. 1982, ch. 1594, § 10, p. 6309.) Blue Cross took advantage of the new legislation and in the mid-1980's rolled out a new health plan product known as the prudent buyer plan.

The basic concept was this: Physicians and hospitals participating in the prudent buyer network would agree to charge Blue Cross subscribers lower fees. Blue Cross in turn would pay a greater percentage of the cost of care provided by network physicians and hospitals. Subscribers had total freedom to choose a physician from within this network of contracting providers, and Blue Cross encouraged subscribers to select their physicians from within the network.

Unlike a health maintenance organization, Blue Cross would pay a benefit if the subscriber chose a nonnetwork provider, but this choice came at a

---

[1]All statutory references are to the Insurance Code unless otherwise indicated.

price for the subscriber as reflected in a significantly reduced benefit payment. In the relevant time period, this benefit was 70 percent of the amount for a particular item of care as set forth on a separate "limited fee schedule." This translated to approximately 30 to 40 percent coverage for out-of-plan services, based on customary and reasonable rates for a given area. Blue Cross also offered the more expensive Choice Plan, which paid nonnetwork benefits equivalent to 80 percent of the physician's customary and usual charges.

A disability insurance policy cannot be issued without approval from the Insurance Commissioner. (§ 10290.) Approval will be withheld if the Insurance Commissioner finds that that the policy "is unintelligible, uncertain, ambiguous, or abstruse, or likely to mislead a person to whom the policy is offered, delivered or issued." (§ 10291.5, subd. (b)(1).) It is undisputed that the policy in question was approved by the Insurance Commissioner.

B. *The Policy and Promotional Materials*

In 1991 Van Ness contacted insurance agent Jill Ramage about purchasing health insurance. Ramage sent him the standard prudent buyer classic plan brochure. The first page of text summarized the two-tiered benefit structure available under the prudent buyer plan.

Under the heading "How You Can Save Money," the brochure stated: "Blue Cross has found a way to control escalating medical expenses for subscribers. We have negotiated discounted rates with a network of physicians and hospitals across the state. These providers give Blue Cross subscribers a discount for care."

On the same page, the "Choice of Providers" section stated that approximately 54 percent of active independent physicians and more than 260 hospitals in California participated in the network. It went on to explain that the subscriber could choose any of those providers and receive the discounted rate, but if the subscriber used a nonnetwork provider, Blue Cross would "still provide you with benefits, although we will pay a lesser percentage of a limited fee schedule for those services. You will pay a greater share of cost when you use a non-Prudent Buyer Plan provider."

The brochure further indicated that with respect to nonplan providers, covered services "are paid at 70% of the Blue Cross limited fee schedule." This statement was reiterated in the discussion about the policy's stop-loss protection.

The brochure also directed potential purchasers to the policy itself "for exact terms and conditions" of coverage, noting that they could request a

copy to review. Finally, new subscribers were given 10 days from the date the policy arrived to study the policy and either accept or decline the insurance.

The policy itself reiterated the right to reject the plan, and cautioned, in capital letters, that benefits for nonproviders were different than for participating providers. Further, it directed the policyholder to the benefits section for determination of those differences.

The policy went on to define "Non-Participating Provider" as one who has not contracted with Blue Cross at the time services are rendered, cautioning that coverage for services from nonparticipants "is limited as stated in the Benefit Schedule or appropriate benefit sections of this Agreement." The term "limited fee schedule" was defined[2] as well, and the payment section stated that the plan paid "70 percent of the Limited Fee Schedule for Covered Expense."

The benefit schedule section of the policy included a separate heading for "Non-Participating Physician Maximum Covered Expense," which stated that these expenses "will not exceed the amount obtained by multiplying the RVS [relative value schedule] unit value of that service established by the Blue Cross of California Relative Value Schedule by the appropriate unit allowance . . . ." Unit allowances for surgery, anesthesia, medicine, radiology and pathology were listed by geographical service areas, followed by the RVS which contained a partial listing of unit values for some 39 representative procedures.[3]

C. *Appellant's Experience*

In conversations with Van Ness, insurance agent Ramage discussed the prudent buyer plan, as well as another product that was more expensive but

---

[2]Specifically: "Limited Fee Schedule is the maximum amount that we will consider as Covered Expense when you receive care for treatment from a Non-Participating Provider. The Limited Fee Schedule is subject to any applicable Rates or Levels of Payment contained in the benefit sections of this Agreement." "Covered Expense" means "the expense you incur for covered services, but not more than the maximum amounts stated in the Benefit Schedule or the applicable benefit sections of this Agreement."

[3]The limited fee schedule for physician services thus has two components: (1) the "unit allowance" for the particular category of medical procedure involved, e.g., surgery, by service area; and (2) the "unit value" for the specific procedure, e.g., skin biopsy, as identified on the RVS.

Since at least 1969, relative value studies have been published in California which express unit values for particular items of service. These can serve as a guide to physicians in establishing fees. Relative value studies can also be used in determining the reasonableness of medical charges for industrial injuries. (*Gould v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059, 1068-1069 [6 Cal.Rptr.2d 228].)

paid greater out-of-plan benefits. They talked about the fact that there were not many providers "in the north state" and Van Ness's desire to stay with his own doctor "anyway." Van Ness opted for the less expensive plan. Ramage sent him the appropriate materials. She also sent him a nonnetwork area letter explaining that there was no "Prudent Buyer Plan network available" in his area, and if he wanted to proceed with Blue Cross he should be aware of certain facts, namely: (1) nonnetwork benefits were limited, with Blue Cross paying a lesser percentage of a limited fee schedule; and (2) he would "pay a substantially greater share of cost" when using a nonplan physician. Van Ness signed the acknowledgment at the bottom of the letter.

At the time Van Ness enrolled in the prudent buyer program, he had the perception that "Blue Cross would pay 70 percent and I would pay the rest." He got that perception from previous experience involving his wife. His understanding was that any fee schedule would be based on "the lower end of an average of what doctors in the area charge for a procedure." When asked if he could point to any language in the materials that would support his understanding, he replied: "Again, as I said before, there was nothing in the literature that distinctly said that. [¶] But from my previous experience dealing with insurance companies with my wife . . . ."

Van Ness underwent a colonoscopy in January 1992, performed by Dr. McCabe, his nonnetwork physician. Dr. McCabe charged $825 for the procedure. Van Ness submitted the claim to Blue Cross. Blue Cross's explanation of benefits for that claim indicated that the billed amount exceeded covered charges by $429; thus Blue Cross had approved benefits in the amount of $396. Subtracting the annual deductible and copayment, the actual amount paid was $182.99.

Van Ness complained that the allowed benefits were extremely low and asked that Blue Cross reconsider the fee schedule. In conjunction with this request Van Ness submitted a listing of fees charged by other doctors in the area, again assuming that the fee schedule was tied to customary and reasonable fees. He was told that benefits were limited to 70 percent of the limited fee schedule. After going through the process of submitting a claim, asking for a reconsideration, etc., Van Ness finally realized "the real meaning of 'limited fee schedule.' "

Van Ness ended up filing a class action complaint for breach of contract, breach of the covenant of good faith and fair dealing and fraud. Along the way he added claims for unfair and fraudulent business practices and violation of the Consumer Legal Remedies Act. (Civ. Code, § 1750 et seq.) The court certified the class. Blue Cross petitioned unsuccessfully for mandamus relief from that ruling.

The parties brought cross-motions for summary judgment (Blue Cross) and summary adjudication (Van Ness). Legal issues concerning construction of the policy were submitted to a special master, who concluded that "the policy adequately discloses the relevant information and is not uncertain, deceptive or unconscionable." Therefore, the special master recommended that the trial court grant Blue Cross's motion and deny that of Van Ness. The trial court adopted these recommendations and entered summary judgment for Blue Cross. This timely appeal followed.

## II. Discussion

### A. *Standard of Review*

On review of a summary judgment favoring the defendant, we look at the record anew to determine whether the defendant conclusively has shown that (1) one or more elements of a cause of action cannot be established, or (2) there is a complete defense. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].)

### B. *Scope of Appeal*

In his briefs Van Ness lays out what amounts to an off-policy dissertation assaulting the merits and historical circumstances underlying development of the Blue Cross prudent buyer program. This history lesson crescendos to the denouncement that prudent buyer out-of-plan coverage "is a joke . . . on the consumer" that in effect extinguishes freedom of choice.

This approach may have been useful in the approval proceedings before the Insurance Commissioner and any subsequent judicial review of the commissioner's action. (§ 10290 et seq.) Briefly, the purposes of those proceedings are to (1) prevent "fraud, unfair trade practices, and insurance economically unsound to the insured" (§ 10291.5, subd. (a)(1)); and (2) assure that policy language "can be readily understood and interpreted" (§ 10291.5, subd. (a)(2)). The standards for approval are significant and include the mandate to withhold approval of any disability insurance policy "[i]f, irrespective of the premium charged therefor, any benefit of the policy is, or the benefits of the policy as a whole are, not sufficient to be of real economic value to the insured." (§ 10291.5, subd. (b)(7)(A).) If the commissioner approves a policy that does not comply with this requirement, he or she has authority to revoke approval for good cause. (Cal. Code Regs., tit. 10, § 2196.4.) And if an insured believes the commissioner has abused his or her discretion in approving a policy in violation of section 10291.5, the

insured may petition for a writ of mandamus requiring the commission to revoke the approval. (See § 10291.5, subd. (h); *Peterson v. American Life & Health Ins. Co.* (9th Cir. 1995) 48 F.3d 404, 410-411.) An otherwise valid policy is a binding contract that governs the parties' obligations until the commissioner revokes approval. This is because, as between the insurer and insured, a policy approved by the commissioner " 'is conclusively presumed to comply with' " section 10291.5. (*Peterson, supra,* at p. 410.)

Van Ness did challenge approval of the prudent buyer plan. Thus, at this juncture our inquiry turns more narrowly on interpretation of the 1990 prudent buyer policy and program brochure with respect to the level of out-of-network benefits provided. We undertake this process according to familiar rules.

## C. *General Principles*

Although insurance contracts have special features, they nonetheless are contracts governed by the ordinary rules of contract interpretation. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The overriding goal of contract interpretation is to give effect to the parties' mutual intentions as of the time of contracting. (Civ. Code, § 1636.) Where contract language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further. (Civ. Code, §§ 1638, 1639; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) "The words of a contract generally are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or 'a special meaning is given to them by usage. . . .' (Civ. Code, § 1644.)" (*Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295].) Moreover, we read a contract as a whole in order to "give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

But if the terms of a promise are ambiguous or uncertain, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.) "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' " (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) It is only when this rule does not resolve the ambiguity that we resolve it against the insurer. (*Ibid.*) Thus, the court's first job in resolving a claim for coverage based on a purported ambiguity in the policy language is to establish "whether coverage is consistent with the insured's

objectively reasonable expectations." (*Ibid.*) And once again we do this by interpreting the language in context, with attention to its intended function in the policy. This is because we do not find contract language ambiguous in the abstract. Rather, we construe contractual language in the context of the instrument as a whole, and under the circumstances of the case. (*Ibid.*)

## D. *Breach of Contract Claim*

In his breach of contract cause of action, Van Ness prayed for judgment that resort to the limited fee schedule "to exclude or limit claims payments" constituted a breach of contract. Further, he prayed that benefits be paid "without reduction based upon the non-participating provider limited fee schedule." On appeal his overriding message is that the limited fee schedule is unenforceable as a limitation on health care coverage. This is so, he argues, because the policy does not "clearly and understandably communicate" to the average layperson "the severe limitation on coverage represented by the limited fee schedule." Thus he contends that the policy should be construed and enforced to effectuate his reasonable expectation that Blue Cross will pay "roughly" 70 percent of a nonparticipating provider's usual and customary charges.

The rule governing coverage exclusions is straightforward: They must be conspicuous, plain and clear. (*Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 719 [193 Cal.Rptr. 632].) Beyond the conspicuousness requirement, the language of the exclusion "must be expressed in words which are 'plain and clear.' This means more than the traditional requirement that contract terms be 'unambiguous.' Precision is not enough. Understandability is also required. To be effective in this context, the exclusion must be couched in words which are part of the working vocabulary of average lay persons." (*Id.* at p. 723.) These requirements have been held to operate independently of the reasonable expectations of the insured. (*20th Century Ins. Co. v. Liberty Mut. Ins. Co.* (9th Cir. 1992) 965 F.2d 747, 753-754.)

We do not accept Van Ness's characterization that the limited fee schedule operated as an exclusion from coverage. The special master correctly reasoned that the limited fee schedule was not an exclusion from coverage because nothing in the schedule restricted the kinds of covered services under the policy. Instead, it fixed the maximum amount Blue Cross would pay for those services when obtained from a nonparticipating provider.

Insurance policies have two parts: (1) the insuring agreement which defines the type of risks covered under the policy; and (2) the exclusions,

which remove coverage for certain risks which initially fall within the insuring clause. (*Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497 [66 Cal.Rptr.2d 714].) Exclusions serve two purposes: They avoid coverage for risks the insurer elects not to insure and limit coverage for risks normally covered by other insurance. For example, the exclusions and limitations section of the policy in question states that benefits will not be provided for cosmetic surgery or for risks normally covered by workers' compensation laws.

■ Against this framework it is clear that the limited fee schedule is part of the insuring clause. First, the colonoscopy surgery is not one of the uninsured risks listed in the exclusions and limitations section. Rather, it was a "covered" service for which Van Ness, as the policyholder, was entitled to benefits under the policy. Indeed Blue Cross paid him on the claim for that procedure, up to the amount allowed under the limited fee schedule.

Second, the limited fee schedule is set forth in the policy's benefits schedule, which in turn shows the "maximum Covered Expense" for each type of provider, namely participating and nonparticipating providers. The schedule does not identify risks that are not insured, but rather identifies the extent of benefits available for nonnetwork care. Thus it is not subject to the *Ponder* test.

The reality is that the prudent buyer policy unambiguously afforded and described a two-tiered benefit structure. The introductory section conspicuously and clearly informed the policyholder that there were two benefit tracks: "HOWEVER, THE AMOUNT OF BENEFITS PAYABLE UNDER THIS AGREEMENT WILL BE DIFFERENT FOR NON-PARTICIPATING PROVIDERS THAN FOR PARTICIPATING PROVIDERS. PLEASE READ THE BENEFIT SECTIONS CAREFULLY TO DETERMINE THOSE DIFFERENCES."

The policy's definition section clearly defines the participating provider as one "which has a Prudent Buyer . . . Participating Agreement in effect with us at the time services are rendered." On the other hand, by definition a nonparticipating provider is one "who does not have" such an agreement "in effect with us at the time services are rendered. Covered Expense for services rendered by a Non-Participating Provider is limited as stated in the Benefit Schedule or appropriate benefit sections of this Agreement."

The comprehensive benefits section in turn explains: "Payment is provided as follows for Covered Expense . . . . Covered Expense is expense you incur for Covered Services, but not more than the maximum amounts shown in the benefit section." This section also separates benefits according

to participating providers and nonparticipating providers. For participating providers the plan pays "80 percent of Covered Expense." For nonparticipating providers, "70 percent of the Limited Fee Schedule for Covered Expense." Finally, the benefit schedule section also tracks benefits according to the participating/nonparticipating dichotomy, with covered expenses for the former not to exceed the negotiated fee rate and for the latter not to exceed the limited fee schedule for various services. With respect to nonplan physicians, the benefits section indicates that the limited fee schedule is derived by multiplying the RVS unit value for a service by the appropriate unit allowance for the particular services area.[4]

These provisions clearly and explicitly inform the policyholder that benefits are capped by maximum amount, and that there is a two-tiered benefit structure that pays benefits according to two different schedules, namely the negotiated fee schedule for participating providers and the limited fee schedule for nonparticipating providers. As well, the policyholder learns that the plan pays 80 percent of the negotiated fee schedule for covered expenses incurred for services from a participating provider, and 70 percent of the limited fee schedule in the case of the nonparticipating provider.

Nothing in these unambiguous provisions says Blue Cross agreed to pay 70 percent of nonplan providers' usual and customary charges, and nothing therein leads to an objectively reasonable expectation of such coverage.

Van Ness harps on the fact that the brochure describing the prudent buyer plan touts the plan as providing cost savings and freedom of choice. He argues that the average consumer has a right to expect that " 'freedom of choice' " to go outside the plan would result in reasonable coverage, and that 70 percent of usual and customary fees fulfills that "promise." What Van Ness omits is the crucial link between freedom of choice and savings, namely the extensive network of participating providers with whom Blue

---

[4]If Van Ness's true criticism is that the policy does not state how much Blue Cross pays nonparticipating providers in terms of either specific dollar amounts or a percentage of usual and customary charges, but rather expresses the benefits paid in terms of a formula, we are not swayed. We know of no authority requiring that benefits be expressed in absolute dollar figures or as a comparative percentage of what providers customarily charge. Moreover, insurance provisions need not be perfectly drafted. (*Allstate Ins. Co. v. Condon* (1988) 198 Cal.App.3d 148, 154 [243 Cal.Rptr. 623].) Thus, the policy language is not misleading and unenforceable just because it could be more explicit or precise. (See *Merrill & Seeley, Inc. v. Admiral Ins. Co.* (1990) 225 Cal.App.3d 624, 631 [275 Cal.Rptr. 280].) Additionally, the fact that a formula used in a policy to determine the amount of coverage available "is not as simple as that considered in some cases, does not mean that the formula is ambiguous, uncertain or misleading." (*Apparel City Sewing Machine Co. v. Transamerica Ins. Group* (1982) 129 Cal.App.3d 400, 407 [181 Cal.Rptr. 64].) Again, although it takes a little effort to work the formula, the parts and totality of it are not ambiguous or misleading.

Cross had negotiated discounted rates. The brochure carefully explains the connection: "As a Personal Prudent Buyer Plan member, you can choose from any one of these doctors or hospitals [participating in the Blue Cross prudent buyer plan network] and receive the discounted rate. If you wish to use a physician or hospital which is not part of the network, we will still provide you with benefits, although we will pay a lesser percentage of a limited fee schedule for those services. You will pay a greater share of cost when you use a non-Prudent Buyer Plan provider. (Please refer to your Agreement for the limited Benefit Schedule for non-Prudent Buyer Plan providers." The obvious import of this language is that the subscriber does not benefit from the cost savings if he or she chooses a nonplan provider. To top it off, the letter Van Ness received from Blue Cross reiterated the warning that the policyholder using a nonnetwork provider "will pay a substantially greater share of cost . . . ."

### E.  *Other Claims*

Because the limited fee schedule is not ambiguous and in fact adequately discloses the benefits Blue Cross pays for nonprovider services, and because the schedule does not constitute an exclusion from coverage, Van Ness cannot triumph on his remaining claims of breach of the covenant of good faith and fair dealing, fraud, unfair business practices or violation of the Consumer Legal Remedies Act.

First, breach of the covenant and fraud. There can be no breach of covenant where, as here, a valid, unambiguous contract has been fully performed in accordance with its terms. Moreover, the absence of ambiguity dispels any claim that the policy documents misrepresented the scope of benefits, and hence Van Ness's fraud claim fails. Indeed, his expectations of enhanced benefits did not stem from any representation of Blue Cross to him, either orally or in the policy or promotional brochure, but rather from assumptions based on his wife's experience with another policy altogether.

Next, unfair business practices. Van Ness maintains the policy and promotional brochure are deceptive—and in violation of unfair business practices[5]—because they create the impression that the plan provides "roughly, 70% out-of-plan coverage, with reasonable freedom of choice coverage." Our conclusion that the clear language of the policy and promotional brochure does not support a reasonable expectation that Blue Cross would pay anything beyond 70 percent of the limited fee schedule disposes of this claim.

---

[5]Specifically, as enumerated in Business and Professions Code sections 17200 et seq. and 17500 et seq.

Finally, for similar reasons Van Ness's charge of violation of the Consumer Legal Remedies Act must fail. There is no evidence of any representation that the policy has "sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which [it does] not have" (Civ. Code, § 1770, subd. (a)(5)); or that services "are of a particular standard" when they are of another (*id.* at subd. (a)(7)); or that the "transaction confers or involves rights, remedies, or obligations which it does not have or involve" (*id.* at subd. (a)(14)).

### III.  DISPOSITION

We affirm the judgment.

Sepulveda, J., and Chiantelli, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied May 16, 2001.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.