131 Cal.Rptr.2d 148 (2003)
106 Cal.App.4th 580
Joel K. PARNELL, Plaintiff and Appellant,
v.
ADVENTIST HEALTH SYSTEM/WEST et al. Defendants and Respondents.
No. F038004. 
Court of Appeal, Fifth District.
February 25, 2003.
*149 King & Hanagami and William K. Hanagami, Los Angeles; Law Offices of Ralph B. Wegis and Ralph B. Wegis, Bakersfield, for Plaintiff and Appellant.
Dennis J. Herrera, City Attorney, Joanne Hoeper, Chief Trial Attorney, and David B. Newdorf, Deputy City Attorney, for City and County of San Francisco; Manuela Albuquerque, City Attorney, for City of Berkeley; and Casey Gwinn, City Attorney, for City of San Diego, as Amici Curiae on behalf of Plaintiff and Appellant.
Latham & Watkins, Robert D. Crockett and Sara Mars, Los Angeles, for Defendants and Respondents.
Manatt, Phelps & Phillips, Barry S. Landsberg and Joanna S. McCallum, Los Angeles, for Catholic Healthcare West; Friestad & Giles, Deborah Giles and Christine Friestad for Scripps Health, as Amici Curiae on behalf of Defendants and Respondents.

OPINION
VARTABEDIAN, Acting P.J.
This is an appeal from a judgment on the pleadings entered against plaintiff on *150 his Unfair Practices Act complaint. We reverse the judgment and remand the case for further proceedings.

FACTS AND PROCEDURAL HISTORY
Appellant Joel K. Parnell had medical insurance through the Wholesale Beer Distributor Industry Trust Health Plan (the Plan). The Plan had entered into a contract with Community Care Network (CCN), a "preferred provider" network, which in turn had contracts for medical services with numerous hospitals and doctors. One such hospital with which CCN had a services contract was respondent San Joaquin Community Hospital, owned and operated by respondent Adventist Health System/West. Both entities are California nonprofit corporations; we will refer to them collectively as respondent.
In 1997, appellant was injured in an automobile accident while he was a passenger in a taxicab. Appellant received hospital care from respondent as a preferred provider under the Plan. Respondent presented a claim for payment to the Plan and received payment in full (from the Plan and from appellant's copayment) at the rates specified in the various provider contracts.
Appellant asserted a tort claim against the driver of the vehicle that struck the taxi. When he did so, respondent filed a notice of lien pursuant to Civil Code section 3045.1 (all further statutory references are to the Civil Code except as noted) in the amount of $14,450.40.
Appellant filed the present action in June of 1999, as a class action asserting unfair business practices (Bus. & Prof. Code, § 17200), violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), trespass to chattels, breach of contract, and negligence. Respondent filed a motion for judgment on the pleadings after it answered appellant's first amended complaint. Appellant sought and received dismissal of the class action claims without prejudice.
After a hearing, the trial court filed a minute order on December 8, 2000, granting respondent's motion for judgment on the pleadings.[1] The court concluded the statutory hospital lien "is not constrained by the Hospital's negotiated discount with a health insurance carrier. . . . The langua[]ge of the statute is plain and unambiguous. While plaintiff does not have a personal liability to the Hospital . . . public policy does not mandate that plaintiff should have . . . a windfall from the third party tort feasor in the form of recovery of the full charge billing of the Hospital. . . ."
After judgment was entered for respondent on January 4, 2001, appellant filed a timely notice of appeal.

DISCUSSION

Background
This case involves the common hospital practice of asserting a lien on a patient's tort recovery even though the patient's direct obligation to the hospital has been satisfied by the patient's own medical insurance provider.[2]
*151 Beginning during the Great Depression of the 1930's, states began to enact hospital lien statutes in an attempt to ameliorate the losses incurred upon treatment of insolvent persons. (See Calder, Florida's Hospital Lien Laws (1993) 21 Fla. St. U. L.Rev. 341, 352-353 (hereafter Calder).) By 1939, about 25 states had such laws. (Id. at p. 352.)
In 1961, California passed its own hospital lien act, codified at sections 3045.1 through 3045.6. (See Stats.1961, ch.2080, § 1.) Although amended and expanded in 1992, the original law provided for a lien for the "reasonable and necessary charges" of emergency care in excess of $100 provided to "any person injured by reason of an accident or wrongful act . . . [not covered by workers compensation] . . . if the person asserts or maintains a claim against another for damages on account of his injuries. . . ." (Former § 3045.1.) Emergency care was defined as that provided within 72 hours. (Ibid.) The lien was limited to 50 percent of the patient's recovery by "judgment, compromise, or settlement agreement." (See former § 3045.4; Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies (1997) 15 Cal.4th 213, 222, 61 Cal. Rptr.2d 638, 932 P.2d 210 (Mercy Hospital).)
The original purpose of hospital lien acts nationwide was to "assure hospitals a source of payment for the medical care they provide[d] to nonpaying or indigent accident victims." (Calder at p. 344.) California's statute was no different. As stated in a committee report prepared in connection with the 1992 amendments: "The author states that hospitals, including those that operate trauma centers, treat accident victims, many of whom are uninsured. Many hospitals have problems keeping their emergency rooms open because a large proportion of accident victims are uninsured. The purpose of this bill is to make it possible for hospitals to seek payment, particularly from insurance companies whose clients have accidentally or negligently hurt another person. . . ." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2733 (1991-1992 Reg. Sess.) May 6, 1992, p. 2.)
The 1992 amendments (see Stats.1992, ch. 302, § 1) abolished the distinction between emergency and other hospital treatment: the lien was available for the "reasonable and necessary charges of the hospital." (§ 3045.1.) The hospital lien law has not been amended since 1992.
It is widely understood that much has changed in the area of charges for hospital care since 1961, and even since 1992. As insurance companies sought to contain growth in the cost of hospitalization, through preferred provider agreements and capitation-based health maintenance organizations, there has opened an increasingly wider gap between hospitals'"usual and customary" charges and the amount actually paid for such services by health insurers. (See Fong, Scripps Clinic Plans To Alter HMO Pacts, San Diego Union-Tribune (Nov. 9, 2001) 2001 WL 27299297; Fong, S.D. Hospital Rates Up 19% since 1997, San Diego Union-Tribune (July 31, 2002) 2002 WL 4616969.)
The practice of seeking payment from the patient for amounts not covered either by deductibles or insurance company payment is known as "balance billing." The practice first became controversial in the context of the federal Medicaid law, since administrators of those programs were the *152 most aggressive in reducing payment to hospitals for treatment of participants in the Medicaid program. (Cf. Palumbo v. Myers (1983) 149 Cal.App.3d 1020, 1028-1029,197 Cal.Rptr. 214.)
Many contracts between health insurers and hospitals now provide that the hospital will not seek to bridge the gap between stated charges and payments from the insurer by making a claim against the insured. (See, e.g., Whiteside v. Tenet Healthcare Corp. (2002) 101 Cal.App.4th 693, 703, 124 Cal.Rptr.2d 580; Nishihama v. City and County of San Francisco (2001) 93 Cal.App.4th 298, 306-307, 112 Cal.Rptr.2d 861.)
As the gap between "usual and customary charges" and the discounted rate paid by insurers continued to grow, treatment of insured patients began to look increasingly like treatment of uninsured patients, at least from the hospitals' fiscal point of view. (See Hundley, Bleeding Money, St. Petersburg Times (Feb. 24, 2002) 2002 WL 15925103.) A "Notice of Benefits" entered as an exhibit in the present case, for example, shows that appellant's insurer paid $5,000 (including appellant's $1,000 copayment) in settlement of usual and customary charges of $18,721.80. Faced with shortfall similar in many ways to the shortfall addressed by the original hospital lien acts, hospitals have turned to the assertion of liens under those same hospital lien laws.
In 2000, as a result of complaints about inequitable balance billing by health care associations, the Legislature considered the more limited issue of contract liens asserted by those associations and acted to place limits on the extent of such liens in the balance billing context. (See § 3040; see Assem. Com. on Judiciary, Com. Bill Analysis of Sen. Bill No. 1471 (1999-2000 Reg. Sess.) June 20, 2000, p. 2.) At that time, a group of plaintiffs lawyers urged the Legislature to reexamine the "entire area of health care liens." (Id. at p. 3.) The group pointed out a federal district court case from Texas holding that the Texas hospital lien act did not permit a balance billing lien by a hospital paid in full at its contract rate by the patient's medical insurer (Medicare). (See Satsky v. United States (S.D.Tex.1998) 993 F.Supp. 1027.) The Legislature, however, chose not to address statutory liens at that time.[3]

Public Policy and Statutory Interpretation
While it may well be fair and equitable for an indigent or otherwise nonpaying patient to share up to half of his or her tort recovery with a hospital that has provided for his or her care, the issue of fairness and equity becomes somewhat clouded when the patient, through purchase of health insurance, has made prior arrangements with the hospital to pay for treatment he or she may need at a future time. Such a patient may have purchased medical insurance specifically to limit his or her exposure for medical costs to the deductibles and copayments stated in the insurance policy.
Similarly, it may well be fair as a matter of policy to require a patient who asserts a claim for, and recovers, damages for the usual and customary charges for his or her tort-caused medical treatment to actually *153 pay those usual and customary charges. But the issue of fairness becomes clouded when the patient recovers less than the full "value" of his or her injury (as defined by usual principles of tort law), for example, through a policy-limits settlement that does not differentiate among the various elements of the damages claim that would be presented to a jury.
In these various circumstances, one party may well perceive that other parties received a windfall, no matter how the situation is resolved. If the patient is able to claim and recover the full usual and customary hospital charges, he may be perceived as reaping a windfall if he is not required to pay that over to the hospital. (See Hanif v. Housing Authority (1988) 200 Cal.App.3d 635, 641, 246 Cal.Rptr. 192.) If the patient's damages claim is limited to actual, discounted payments to the hospital under a contract with a medical insurer, the tortfeasor may be perceived as reaping a windfall. (See Lee, Reasonable Medical Treatment Means Actual Cost (Summer 2002) 17 Defense Comment 14 [suggesting tort defense attorneys can achieve a reduction of both special and general damages by limiting plaintiffs to proof of actual medical costs].) If the hospital is paid both its contract rate, which it has agreed will fully discharge the bill for services, and its usual and customary charges merely because there is a solvent tortfeasor, the hospital may be perceived as reaping a windfall. (See Welf. & Inst.Code, § 14019.4, subd. (a) ["Any provider of health care services who obtains a label or copy from the Medi-Cal card or other proof of eligibility pursuant to this chapter shall not seek reimbursement nor attempt to obtain payment for the cost of those covered health care services from the eligible applicant or recipient, or any person other than the department or third party payer who provides a contractual or legal entitlement to health care services."].)
Our task in construing a statute, however, is not to supplant the Legislature's view of fairness or good public policy but, instead, is to implement the law in accordance with the Legislature's intent. (See Droeger v. Friedman, Sloan & Ross (1991) 54 Cal.3d 26, 41, 283 Cal.Rptr. 584, 812 P.2d 931.) In the present case it seems reasonably clear that the Legislature, in originally enacting the 1961 hospital lien act, did not contemplate its application in the context of "balance billing," because the gap between insurance payments for services and "usual and customary charges" for services was not yet of problematical dimensions. (Cf. Calder at p. 367.) When the lien act was amended in 1992, there was no indication in the available legislative history that the applicability of the act in the balance billing situation was considered in any manner.
On occasion, courts must determine from the overall purpose and the legislative history and intent of a statute its applicability in circumstances not directly addressed by the language of the law. (Cf. Regents of University of California v. Superior Court (1999) 20 Cal.4th 509, 534, 85 Cal.Rptr.2d 257, 976 P.2d 808; Spangler v. Memel (1972) 7 Cal.3d 603, 610-611, 102 Cal.Rptr. 807, 498 P.2d 1055.) This is such a case. The question presented is whether the hospital lien act permits a hospital to assert a lien for the unpaid balance of its usual and customary charges after payment by a medical insurer of the full contract obligation for those charges. In answering this question, we are not writing on a blank slate.

Swanson
In Swanson v. St. John's Regional Medical Center (2002) 97 Cal.App.4th 245, 118 Cal.Rptr.2d 325 (Swanson), Division Six of *154 the Second Appellate District of the Court of Appeal considered the same issue presented to us in the present case. The Swanson opinion concluded that the hospital's statutory lien was not extinguished by payment of discounted charges by the patient's medical insurer. (Id. at pp. 249-250, 118 Cal.Rptr.2d 325.) Impliedly, Swanson concluded that the hospital's lien exists for any portion of a patient's hospital bill not covered by the patient's medical insurance. (See id. at p. 249, 118 Cal. Rptr.2d 325.)
Two premises are key to Swanson's analysis; the court cites as authority for each premise Mercy Hospital, supra, 15 Cal.4th 213, 61 Cal.Rptr.2d 638, 932 P.2d 210. First, Swanson rejects the idea that a lien only secures payment of an underlying debt or obligation: the hospital lien under Civil Code section 3045.1 "is a statutory lien and does not require that the patient owe the hospital a debt." (Swanson, supra, 97 Cal.App.4th at p. 249, 118 Cal.Rptr.2d 325, citing Mercy Hospital, supra, 15 Cal.4th at pp. 222-223, 61 Cal. Rptr.2d 638, 932 P.2d 210.) Second, Swanson concludes the hospital "lien is not a charge against the patient. To the contrary, it is a `statutory medical lien in favor of a hospital against third persons liable for the patient's injuries.'" (Swanson, supra, 97 Cal.App.4th at p. 250, 118 Cal. Rptr.2d 325, quoting from Mercy Hospital, supra, 15 Cal.4th at p. 217, 61 Cal.Rptr.2d 638, 932 P.2d 210.)
From these two premises, Swanson concludes: "[W]e are bound by the holding in [Mercy Hospital]. Because the Legislature has determined that hospital liens are exempt from balanc[e] billing limits, we may not override that determination." (Swanson, supra, 97 Cal.App.4th at p. 251, 118 Cal.Rptr.2d 325.)
We believe the Swanson court miscontrues Mercy Hospital; thus its reliance thereon is misplaced, and the two premises it draws from that opinion are erroneous. Instead, as we shall explain, we believe the statute should not be construed to cut the hospital lien free from the mooring of the underlying debt to which it rightfully attaches.

Mercy Hospital
Mercy Hospital concerned the breach by a tortfeasor's insurance company of its duty under section 3045.4 to pay to a hospital "the amount of [the hospital's section 3045.1] lien claimed in the notice, or so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment, compromise, or settlement agreement after paying any prior liens. . . ." (§ 3045.4.) The question before the court was whether the tortfeasor's insurer, who distributed settlement proceeds without paying the lien, was liable for the entire amount of the lien or was liable for the limited, 50 percent portion it should have paid to the hospital. (See Mercy Hospital, supra, 15 Cal.4th at p. 219, 61 Cal.Rptr.2d 638, 932 P.2d 210.) Although not expressly stated, it appears from the court's factual summary that the injured party was uninsured and that he made no payments on his hospital bill. (See id. at p. 216, 61 Cal.Rptr.2d 638, 932 P.2d 210.)
The Supreme Court began its discussion by quoting section 2872: "A lien is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act." (We note that this definition is applicable to title 14 of the Civil Code, which includes section 3045.1, the hospital lien provision.) The court then stated: "There are various types of personal property liens; the one at issue in this case is a statutory nonpossessory lien." (Mercy Hospital, supra, 15 *155 Cal.4th at p. 217, 61 Cal.Rptr.2d 638, 932 P.2d 210.)
The Mercy Hospital opinion then notes that the hospital lien is merely one tool the hospital may employ: "Sections 3045.1 through 3045.6 are not exclusive, and the hospital may still proceed directly against the patient for any unpaid balance." (Mercy Hospital, supra, 15 Cal.4th at p. 217, 61 Cal.Rptr.2d 638, 932 P.2d 210.) The court states that the "apparent purpose of former section 3045.4 was to secure part of the patient's recovery from liable third persons to pay his or her hospital bill, while ensuring that the patient retained sufficient funds to address other losses resulting from the tortious injury." (Ibid.) Later, the opinion notes legislative history to the effect that the hospital lien act originally "was apparently enacted in response to a California Hospital Association's membership survey that revealed at least $90,000 was lost as a result of injured persons collecting a judgment or settlement and failing to `discharge any portion of the hospital bill.' [Citation]." (Mercy Hospital, supra, 15 Cal.4th at p. 222, 61 Cal.Rptr.2d 638, 932 P.2d 210, italics added by the Mercy Hospital.)
Not only is the Mercy Hospital court's description of hospital liens fully consistent with the legislative history disclosing a focus of the hospital lien act on uninsured or insolvent patients, it also expressly includes the hospital lien as among those statutory liens securing "the performance of an act." (§ 2872.) As such, the lien is merely an incident of the underlying debt or obligation. (Lewis v. Booth (1935) 3 Cal.2d 345, 349, 44 P.2d 560.) And while the statute creates a direct obligation of an insurer or tortfeasor who ignores its obligations under section 3045.4, that is not the obligation the lien secures. The section 3045.4 obligation is enforced not through a lien, but by suit against the insurer or tortfeasor, as was done in Mercy Hospital.
We now turn to the passages relied upon by the Swanson opinion. For the proposition that "stare decisis" establishes that the hospital lien exists independently of any debt owed by the patient to the hospital, Swanson cites the following passage from Mercy Hospital: "Whatever principles might generally apply to liens, former section 3045.4 is a statutory, not a common law, lien. The Legislature is, of course, free to define and limit such a lien, and has done so in this case." (Mercy Hospital, supra, 15 Cal.4th at pp. 222-223, 61 Cal. Rptr.2d 638, 932 P.2d 210.) Read in context, the limitation to which the court refers is the limit of the tortfeasor's lien liability to 50 percent of the settlement. The court was not referring to a legislative expansion of common law liens to make the hospital lien exist free from any underlying debt of the patient to the hospital.
The second passage relied upon by Swanson, its quotation from page 217 of the Mercy Hospital opinion, seems equally misplaced. Swanson quotes the Mercy Hospital court as stating the hospital lien is a "statutory medical lien in favor of a hospital against third persons liable for the patient's injuries." (Mercy Hospital, supra, 15 Cal.4th at p. 217, 61 Cal.Rptr.2d 638, 932 P.2d 210.) The full passage states: "Mercy's lien is provided for and defined by sections 3045.1 through 3045.6. These sections, enacted in 1961, were California's first statutory medical lien in favor of a hospital against third persons liable for the patient's injuries. Sections 3045.1 through 3045.6 are not exclusive, and the hospital may still proceed directly against the patient for any unpaid balance." (Ibid.) The passage is immediately preceded by the following sentence: "Here, of course, we address the parameters of a lien that compensates a hospital for providing *156 medical services to an injured person by giving the hospital a direct right to a certain percentage of specific property . . . otherwise accruing to that person." (Ibid., italics added.)
Taking this entire passage in context, we cannot agree that it establishes that a statutory hospital lien "is not a charge against the patient," as Swanson concludes. (See Swanson, supra, 97 Cal. App.4th at p. 250, 118 Cal.Rptr.2d 325.) Instead, Mercy Hospital recognizes that the hospital lien attaches to property that "otherwise" belongs to the patient. While it attaches to that property right when it is in the hands of the third-party tortfeasor or insurer, it only does so because of the patient's right and interest in that property. (Compare Whiteside v. Tenet Healthcare Corp., supra, 101 Cal.App.4th at p. 703, 124 Cal.Rptr.2d 580 [amounts payable by patient's insurance company directly to hospital are not property of the patient].)

Respondent's View of the Text and Legislative History
Respondent does not attempt to explain Swanson's holding when viewed in the full context of the discussion in Mercy Hospital. Instead, respondent cites as support for its position  that the hospital lien exists without regard to an underlying debt  a passage in the Senate Judiciary Committee's analysis in the hearing report on Senate Bill No. 1471, which created section 3040 governing balance billing in the context of contract liens of health maintenance organizations.
The passage from the bill analysis states that the bill to create section 3040 "does not intend to limit hospital liens now available under Civil Code Section 3045.1, nor would it affect liens that a treating medical service provider may assert independently of a health care service plan or disability insurer. . . . [We omit the brief discussion of the Texas case described above, in which the court held that payment of the insurance contract billing extinguished the hospital lien for the covered services.] Although in California hospitals have an independent right to assert a lien under Civil Code Section 304.5.1, this case merely illustrates how the area of health care liens is evolving, as more and more consumers become aware of and challenge billing practices of health care service plans." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1471 (1999-2000 Reg. Sess.) as amended April 27, 2000, pp. 4-5, italics added.)
The statement in the committee analysis is the equivalent of obiter dicta in a judicial opinion: it is a statement made in passing, not purporting to decide the matter stated and not necessary to the holding of the opinion. (See Stockton Theatres Inc. v. Palermo (1956) 47 Cal.2d 469, 474, 304 P.2d 7.) The statement does not cite authority for its claim and is irrelevant to the discussion of the actual purposes of the bill before the committee. We do not believe the analyst's statement reflects California law.
Respondent next contends that the "plain text, purpose and legislative history" of the hospital lien act "do not support any restrictions on the hospital's ability to levy liens thereunder." (Initial capitalization omitted.) Respondent's assertion that section 3045.1 has a clear and unambiguous meaning is erroneous: section 3045.1 is ambiguous and requires judicial interpretation.
First, the phrase "reasonable and necessary charges" is not defined in the statute and, as far as we can discern, is not a phrase with a fixed usage in the law or in the medical services industry. The traditional formulation for a hospital's as-billed charges is that such charges are "usual and customary" or "reasonable and customary." *157 (See, e.g., Van Ness v. Blue Cross of California (2001) 87 Cal.App.4th 364, 368, 104 Cal.Rptr.2d 511.) The traditional formulation for the medical services provided by the hospital is that they were "medically necessary" or "reasonable and necessary." (See, e.g., County of San Diego v. State of California (1997) 15 Cal.4th 68, 105, 61 Cal.Rptr.2d 134, 931 P.2d 312.) In the ordinary use of language, charges that are "usual and customary" might well be synonymous with "reasonable" charges, but one might wonder about the use of "necessary" to further describe the "reasonable" charges. (See Eden Hospital Dist. v. Belshé (1998) 65 Cal.App.4th 908, 920, 76 Cal.Rptr.2d 857 [citing Medicaid regulation requiring that "costs" be "necessary and proper" as distinct from requirement that services be reasonable and necessary].)
It would seem that under a plain-language reading of the statute, the balance-billing charges cannot be deemed "necessary" in any usual sense of the word: such charges are not necessary to obtain services for the patient because he or she has an existing contract right to such services at the rates provided by the medical insurance policy and, under the terms of the various provider agreements, the debt arising from exercise of this right is fully and completely satisfied by the insurer's payment of the contract rate for such services.
In addition, the "plain language" of the hospital lien act, as respondent would read it, does not require the hospital to deduct from its lien amount any payments, partial or otherwise, it receives toward payment of the "reasonable and necessary charges" for services provided to the patient. Thus, as stated by respondent in its trial brief in the court below: "Under common law lien theory, a lien may only be levied as a means of securing an obligation or indebtedness; however, in this case, SJCH levied a statutory lien against a third party. The major limitation under this statutory lien is that it has to be levied for `reasonable and necessary medical charges.' Obligation or indebtedness is [] not a contingency." (Italics added.)
Presumably, respondent would not overtly assert its right to be paid by the patient's medical insurer as well as to be paid in full by each tortfeasor who can be held responsible for the patient's injury. Presumably, whether through an exegesis of "reasonable" or "necessary," or both, respondent would contend that the statute impliedly limits it to a single payment for its full as-billed charges. But the point is, the plain language of the statute, if viewed as rendering the patient's debt or obligation to the hospital irrelevant, does not express any such limitation. The only limitation expressed in the hospital lien act is the 50 percent of net recovery limit contained in section 3045.4. Any other limitation must be introduced through statutory construction.
The Silence of the Legislative History
A striking absence from the available legislative history undermines respondent's interpretation of the hospital lien act. We may view the matter through the lens of an example: An uninsured hospital patient incurs a bill of $5,000. Upon discharge, the patient goes to the hospital finance office and says, "I can pay you $3,000 now or $100 per month for 50 months. Take one or the other, or sue me." The hospital representative elects to accept $3,000 as full payment of the patient's bill. The next day, however, the hospital files a lien for $2,000 against the patient's potential recovery from the tortfeasor who put the patient in the hospital. Does the hospital lien law, on its face, allow or disallow such a lien? Would such *158 a lien comport with the "purpose and history" of the hospital lien act?
We think, based on the purposes of the act as disclosed in the available legislative history, the hospital lien act did not, and was not intended to, rewrite California law of accord and satisfaction in such a manner as to permit the hospital to assert a lien in the foregoing circumstances. (See §§ 1521-1523 [statutory principles of accord and satisfaction].) Nor do we see any indication in the language, purpose, or history of the law that would effect such a change if the compromise were reached with, and the discounted charges were paid by, the patient's relatives, church, or medical insurer.
Whether it makes the choice at the time of entering into a provider contract with a medical insurer or in negotiations with the patient after services have been provided to a particular patient, it is the hospital's choice to accept or refuse the level of payment offered by the payor. In either case, we see nothing in the statute designed to relieve a hospital of its choice to provide services at a price below the "usual and customary" charges for such services.

The Documentary Evidence in the Present Case
It is of some interest, in this regard, to examine the language of the documents in the record in the present case.
When appellant was billed for usual and customary charges of $18,721.80 in 1997, he received from the insurer a notice that the insurer had paid $5,000 on the bill. The "amount ineligible" column of the notice, indicating an amount of $13,721.80, was marked with "code 32." At the foot of the notice, code 32 is explained as follows: "This amount is the CCN discount received for using a CCN facility.[4] This amount will be `written off' by the facility." This "written off balance is, however, the primary basis for the hospital lien filed against appellant's recovery in his action against the tortfeasor who put him in the hospital. Hospital officials testified that the debt was "written off only for the hospital's accounting purposes.
The contract between the hospital and CCN provides that the hospital agrees to provide services for the "reimbursement amounts" set forth in the contract. "Reimbursement amounts" is defined as "payment in full to Contract Hospital for Inpatient and Outpatient Services provided to a Beneficiary pursuant to Payor Agreements . . . ."
While this contract does provide that "it is not the intention of either CCN or Contract Hospital that [beneficiaries] occupy the position of intended third party beneficiaries of the obligations assumed by either party to this Contract," the contract also provides that "Contract Hospital hereby specifically authorizes CCN to act in its behalf in contracting for the provision of Inpatient Services and Outpatient Services at the Reimbursement Amounts set forth" elsewhere in the contract. Pursuant to this authority as agent for the hospital, CCN entered into its contract with appellant's medical insurer. That contract, which contains no similar exclusion of the insureds as third-party beneficiaries, states that the insurer "agrees to reimburse . . . the preferred providers according to the Reimbursement Amounts specified in CCN's Provider Agreements. Those Reimbursement Amounts include deductible and copayment amounts and *159 shall constitute payment in full for Health Care Services . . . provided to Beneficiaries by CCN providers." Respondent's summary claim that it is not bound by this contract is frivolous.[5]
CCN also provides a patient manual to insureds participating in the medical insurance program offered by the Beer Wholesalers Association. That manual explains: "CCN is a voluntary, optional program for you. Each time you need care, you decide whether to use a CCN preferred provider. Some advantages of choosing CCN providers are that: [¶] . . . [¶] They will collect only patient copayments (deductibles, coinsurance and noncovered services), not the full amount of the charges;. . . ." The manual also states that the insured will receive an "`Explanation of Benefits' from your health plan [which] should show both the billed charges and the CCN contract rates for services. You are not responsible to pay the difference between these amounts."
The trial court concluded that section 3045.1 should not be interpreted to implement these contract limitations on the patient's obligation to the hospital because "public policy does not mandate that plaintiff should have the benefit of a windfall from the third party tort feasor in the form of recovery of the full charge billing of the Hospital where discounted access to health care has been provided by the Hospital's contract with health insurance carrier." Similarly, in its trial brief, respondent took the position that "the lien procedure . . . merely seeks to intercept payments Parnell claims to have incurred as medical expenses which he did not incur, up to the market value of the Hospital's services."
The first problem with both statements is that the pleadings do not disclose that appellant here pled and proved in an action against the tortfeasor that he had medical bills from this hospital in excess of the amounts paid by his medical insurer, nor that he prayed for duplicate recovery of what the medical insurer paid the hospital.[6] The second problem is that the interpretation of a statute is not an ad hoc exercise that is to be based upon the facts of one case in isolation from the universe of cases to which the statute potentially may be applicable.[7] The third problem is that, granting that the equities might favor respondent if the facts were as the statements presuppose, there is no proposed construction of the statute that would be limited to the situation described while excluding the class of cases in which the award or settlement does not compensate the injured patient for all his or her compensable *160 losses in addition to the "usual and customary" charges he or she did not incur.
Based on the foregoing considerations, we conclude a hospital that has received full payment for services under the terms of its contract with a medical insurance provider is not entitled to file a lien to recover the difference between that payment and the hospital's "usual and customary" charges for similar services. Because section 3045.1 does not authorize a lien in those circumstances, the judgment of the trial court must be reversed.

Issues not Presented by this Appeal
Not decided in the trial court and unbriefed on this appeal is the issue of litigation immunity for the filing of notices of liens. Section 47, subdivision (b), undoubtedly precludes certain of appellant's causes of action to the extent they are based on the filing of such notice. (See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 182, 83 Cal.Rptr.2d 548, 973 P.2d 527.) At a minimum, however, the litigation privilege does not bar appellant from seeking declaratory relief, including declaratory relief construing the applicability of a statute in particular circumstances. (See Wilton v. Mountain Wood Homeowners Assn. (1993) 18 Cal.App.4th 565, 571, 22 Cal. Rptr.2d 471; Lane v. City of Redondo Beach (1975) 49 Cal.App.3d 251, 255, 122 Cal.Rptr. 189.)
On this appeal, we will not attempt to sort out the causes of action and types of relief to which appellant may be entitled. We hold only that, based on the pleadings before the trial court, appellant has stated a cause of action for declaratory relief under the Unfair Practices Act (Bus. & Prof.Code, § 17200) and the judgment against him, dismissing this action, was erroneous.

DISPOSITION
The judgment is reversed. The matter is remanded for further proceedings in accordance with the views expressed in this opinion. Appellant is awarded costs on appeal.
WE CONCUR: LEVY and CORNELL, JJ.
NOTES
[1] The court took the motion under submission and then, by stipulation, conducted a trial sitting without a jury, limited to liability and equitable issues. During the trial, the parties stipulated to various facts for purpose of the motion. Other evidence was received for purposes of the trial only. At the close of trial, the court took the matter under submission. The ensuing statement of decision determined only the motion for judgment on the pleadings, and the judgment as entered conformed to that ruling.
[2] We recognize that at least two cases raising this issue are currently pending before the Supreme Court. (McMeans v. Scripps Health, Inc, review granted Nov. 26, 2002, S109573; Olszewski v. Scripps Health, review granted Aug. 29, 2001, S098409.)
[3] A former collections supervisor for respondent testified that three or four years before trial, which was held in 2000, respondent stopped filing balance-due liens against patients with Blue Cross medical insurance because "there was an objection from Blue Cross based upon, I believe, the contract" between that insurer and respondent. It is not clear whether the parties considered this information as submitted in conjunction with the motion for judgment on the pleadings. (See fn. 1, ante.)
[4] The various contracts require appellant's medical insurer to encourage its insureds to use "preferred providers" and to structure its plan so that insureds' deductibles and other costs are less if they use preferred providers.
[5] Respondent apparently claims appellant has no enforceable right against it for services to be provided at the contract rate. According to respondent, any such contract limitation "relates to CCN's obligations and does not restrict the Hospital's rights under its Hospital Contract or the [hospital lien act]."
[6] The evidence admitted at trial (see fn. 1, ante) was to the effect there was a policylimits ($15,000) settlement and that appellant had $42,000 in lost wages, together with over $50,000 in medical bills. In addition to his initial hospitalization, he had two subsequent neck surgeries. He was left permanently restricted from heavy lifting, which was a requirement of his previous employment. Although it is not clear from the record whether the stipulation was for purposes of the motion or only for the trial, the parties stipulated that the "damage[s] potential in the case was substantially in excess of policy limits."
[7] Despite its conclusion that "public policy does not mandate that plaintiff should have the benefit of a windfall from the third party tort feasor in the form of recovery of the full charge billing of the Hospital where discounted access to health care has been provided," during the trial, the court recognized the general rule stated in the text: "I'm not sitting here looking to decide the case on the basis of comparative windfalls or lack thereof."